88 A.2d 128 (1952)
In re OPINIONS OF THE JUSTICES.
Supreme Court of Delaware.
April 1, 1952.
*129 PER CURIAM.
To His Excellency Elbert N. Carvel, Governor of Delaware:
The Justices of the Supreme Court refer to your letter dated January 16, 1952, addressed to the Chief Justice, propounding certain questions upon which the opinions of the Justices are requested. These questions are as follows:
1. In the case referred to in Mr. Reichert's letter, would the Attorney General be disqualified to investigate the charge by Mr. Reichert?
*130 2. If the Attorney General is disqualified in such a case, does the Governor have the power to name a special prosecutor to investigate these charges?
3. Is there any way that this complaint can be laid before the Grand Jury of New Castle County without action by the Attorney General?
The letter referred to concerns a request of the writer for an investigation by the grand jury of alleged vote-buying in recent elections in Blackbird Hundred, New Castle County, and a further request that the Governor appoint a special prosecutor to conduct the investigation because of the alleged disqualification of the Attorney General.
Upon receipt of your letter the Justices of the Supreme Court requested the assistance of counsel to brief and argue the questions propounded in your letter, as well as certain additional questions deemed pertinent to the consideration of the questions propounded.
The additional questions are as follows:
Whether the provisions of Paragraph 374 of the Revised Code of Delaware of 1935 are constitutional and valid.
Whether, if such provisions are constitutional and valid they are applicable to the Supreme Court, or to the members of the Supreme Court, as now constituted.
Whether, if the first two questions are answered in the affirmative, any or all of the questions posed by the Governor fall within the purview of those provisions.
Accordingly, the questions propounded by you, as well as the additional questions, have been briefed and argued by the counsel designated for the purpose.
The Justices of the Supreme Court, having now fully considered the questions upon which their opinions have been requested, as well as the additional questions above mentioned, respectfully submit the opinions set forth below.
1. Upon the Governor's first question the opinion of all the Justices is as follows:
Paragraph 374 of the 1935 Code reads as follows:
"The Chancellor and Judges, whenever the Governor shall require it for public information, or to enable him to discharge the duties of his office with fidelity, shall give him their opinions in writing touching the proper construction of any provision in the Constitution of this State or of the United States, or the constitutionality of any law enacted by the Legislature of this State."
In our opinion, the subjects upon which advisory opinions may be required are those specified in the statute and none other. The first question propounded is not one touching the construction of any provision in the Constitution of this State or of the United States, or the constitutionality of any law enacted by the Legislature of this State, and hence is not one contemplated by the statute. We find no provision in the Constitution of this State which bears upon the subject of disqualification of the Attorney General arising from personal interest or bias in a particular case, or any provision the construction or interpretation of which would supply any answer to this question. Moreover, the question of disqualification is one primarily of fact, to be judicially determined by a court in a proper proceeding; it cannot be determined by the Governor ex parte. Hence an answer to the question is not required to enable the Governor to discharge the duties of his office.
We are of opinion that the first question is not one within the purview of the provisions of Paragraph 374 of the Revised Code of 1935, and must respectfully request to be excused from making answer thereto.
2. Upon the second question the opinion of all the Justices is as follows:
Since the question of the alleged disqualification of the Attorney General has not been determined, the question is a hypothetical one. Members of the judiciary in other states requiring advisory opinions to the other departments of the government have consistently adhered to the rule that answers to hypothetical or theoretical questions may not properly be required or given. The question proponded should have a bearing upon a present constitutional duty awaiting performance by the executive. *131 In re Opinion of the Justices, 217 Mass. 607, 105 N.E. 440; Opinion of the Justices, 72 Me. 542; In re Opinion of the Justices, 1950, 254 Ala. 177, 47 So.2d 655.
Our statute requires such opinions "whenever the Governor shall require it for public information, or to enable him to discharge the duties of his office with fidelity". It is our opinion that the Governor's second question is not one contemplated by the statute, since unless and until the alleged disqualification of the Attorney General shall be made to appear, no question of public concern is presented, nor is the discharge of any official duty by the Governor required.
We are of opinion that the second question of the Governor does not fall within the purview of the provisions of Paragraph 374, and must respectfully request to be excused from making answer thereto.
3. Upon the third question the opinion of all the Justices is as follows:
This question concerns the right and power of the Governor, in the performance of his constitutional duty to take care that the laws be faithfully executed (Article III, Section 17), to cause to be presented to the grand jury of New Castle County, without the intervention of the Attorney General, a complaint with respect to alleged violations of the laws punishing bribery at elections; and calls for a construction of the provisions of the State Constitution applicable thereto.
Article I, Section 4, of the Constitution of Delaware provides:
"Trial by jury shall be as heretofore. Provided, however, that Grand Juries in New Castle County shall consist of fifteen members, one of whom shall be selected from, and shall be a resident of, each representative district in said county, and the affirmative vote of nine of whom shall be necessary to find a true bill of indictment; and the Grand Juries in Kent County and in Sussex County shall consist of ten members, one of whom shall be selected from, and shall be a resident of each representative district in the County in which he or she is selected, and the affirmative vote of seven of whom shall be necessary to find a true bill of indictment."
Section 8 of the same article provides:
"No person shall for any indictable offense be proceeded against criminally by information, except in cases arising in the land or naval forces, or in the militia when in actual service in time of war or public danger; * * *."
The effect of these provisions, in our opinion, is to establish the grand jury as a constitutional body and "to preserve the historical and highly prized safeguard of Grand Jury action", State v. Lyons, 1 Terry 77, 83, 40 Del. 77, 83, 5 A.2d 495, 497, with its common law powers and attributes, except as modified by other provisions of the Constitution. Cf. In re Opinion to the Governor, 1939, 62 R.I. 200, 4 A.2d 487, 121 A.L.R. 806.
The grand jury is an appendage of the court, charged primarily with the duty of investigating violations of the law and of finding indictments and presentments against accused persons. 24 Am.Jur. Sec. 2. Whether, in the exercise of its inquisitorial powers it may hear and act upon any complaint from any source, see Brack v. Wells, 184 Md. 86, 40 A.2d 319, 156 A.L.R. 324, or whether it is restricted in its investigations to those matters which are presented to it by the prosecuting officer, see In re Charge to the Grand Jury, Fed.Cas.No.18,255, 2 Sawy. 667, is a question we need not consider, since we think that the answer to the Governor's third question depends upon the nature and effect of certain other provisions of the Constitution dealing specifically with arrests and prosecutions for bribery at elections.
Article V, Section 7, creates and defines certain offenses relating to the giving or receiving of money or other valuable thing or inducement for giving or withholding a vote at any general, special or municipal election in the State or at any primary election convention or meeting held for the purpose of nominating any candidate or candidates to be voted for at any such general, special or municipal election, as well *132 as certain other offenses against the purity of the ballot; and prescribes the penalties therefor.
Section 8 of the same article provides in part as follows:
"Every prosecution for any of the offenses mentioned in Section 7 of this Article shall be on information filed by the Attorney-General, after examination and commitment or holding to bail by a judge or Justice of the Peace, and the cause shall be heard, tried and determined by the court without the intervention of either a grand jury or petit jury. The accused if adjudged guilty of the offense charged against him, shall have the right at any time within the space of three calendar months next after sentence is pronounced to an appeal to the Supreme Court. The court below, or any judge thereof, in term time or vacation, shall upon application by the accused allow such appeal; but such appeal shall not operate as a supersedeas unless the appellant shall at the time of the allowance thereof give an appeal bond to the State of Delaware in such amount and with such surety as shall be approved by such court or judge. On such appeal the Supreme Court shall, with all convenient speed, review the evidence adduced in the cause in the court below, as well as the other proceedings therein, and the law applicable thereto, and give final judgment accordingly, either affirming or reversing the judgment below. If the appellant shall fail to prosecute his appeal pursuant to the rules and practice hereinafter provided for, the Supreme Court shall affirm the judgment of the court below. Where the sentence in the court below includes a term of imprisonment and an appeal bond is given and approved in manner aforesaid, the Supreme Court, if it affirm the judgment below, shall sentence the appellant to a term of imprisonment equal to that imposed by the court below, after deducting therefrom a period equal to the time of imprisonment, if any, already suffered by him under the sentence of the court below. The surety or sureties in any appeal bond given under the provisions of this section shall have the right at any time after its approval and until final judgment shall be rendered by the Supreme Court, and, in case the judgment of the court below shall be affirmed, until the expiration of the space of thirty days next following such affirmance, to take, wherever found, and render the appellant to the sheriff of the county in which he was sentenced; and a certified copy of the appeal bond shall be the sufficient warrant for such surety or sureties for such taking and rendering. If the Supreme Court shall reverse any judgment of the court below imposing a fine, and if the accused shall have fully paid such fine and the costs of prosecution, the amount thereof shall be refunded to the appellant through a warrant drawn by the court below on the treasurer of the county in which the accused was sentenced. * * No person shall be adjudged guilty of an offense mentioned in Section 7 of this Article without the concurrence of all the judges trying the case; and upon appeal no judgment of the court below shall be affirmed without the concurrence of all of the judges of the Supreme Court sitting in the case, and their failure to concur as aforesaid shall operate as a reversal of the judgment of the court below; provided, however, that such concurrence of the judges sitting in the Supreme Court shall not be necessary for the affirmance of the judgment of the court below where the appellant shall fail to prosecute his appeal pursuant to the rules and practices herein provided for."[1]
The offenses alleged by your correspondent to have been committed appear to concern alleged vote-buying in the primary or *133 general elections in Blackbird Hundred, New Castle County. Such offenses, if committed, are among those created by and defined in Section 8 above quoted.
We are of opinion that the procedure for the prosecution and punishment of persons guilty of any such offense is that prescribed by Section 8, and that it is exclusive of any other procedure. The comprehensive nature of the constitutional provisions compels this conclusion. Every essential step in the course of the prosecution, from the holding to bail until the final judgment of the Supreme Court, is provided for. In many respects the proceeding is sui generis. Not only is an indictment or presentment dispensed with, but the right of trial by petit jury is denied. Concurrence of all of the judges of the Supreme Court is required for affirmance of a conviction, and they are required to review the facts as well as the law.[2] The time of appeal, in other cases five years,[3] is reduced to three months. Special provisions dealing with the procedure on appeal are added. Finally, the provisions are mandatory  not permissive. So far as concerns the common law duties and powers of the grand jury, we think the intent of the framers of the Constitution to supersede them is a necessary inference. See 1 Sutherland, Statutory Construction, Sec. 2018. Moreover, there is nothing in the Debates of the Constitutional Convention suggesting that it was the intent of the framers to preserve, as respects the offenses created by Section 7, any part of the grand jury's power of investigation; on the contrary, it is a fair inference that it was their intention to exclude the grand jury as well as the petit jury from any connection whatever with the investigation or prosecution of the offenses created by Section 7. See Vol. 3, pp. 1353, 1743, 1756.
It has been suggested to us that although the grand jury has been specifically stripped of its common law power to present an indictment for any such offense, it yet retains its inquisitorial powers with respect thereto. It would be quite unreasonable to believe that it has been left with the right or duty to investigate a crime concerning which any effective action is specifically prohibited. Indeed it is to be seriously doubted whether the grand jury's powers of investigation of criminal offenses at common law extend to offenses in respect of which it has no power of presentment or indictment. See In re Report of Grand Jury of Baltimore City, 152 Md. 616, 137 A. 370, in which the Court of Appeals of Maryland says that the grand jury's inquisitorial powers should be exercised "with the single end in view that the accused may be brought to trial in the court whereof the grand jury is a part". 137 A. 372.
We are of opinion that the effect of the provisions of Section 8 of Article V of the Constitution is to withdraw from the grand jury all of its powers of investigation, presentment and indictment in respect of the offenses enumerated in Section 7.
Our answer to the Governor's third question is "No".

Additional Questions Considered
Mention has been made of the fact that the Justices of the Supreme Court requested the briefing and argument of certain other questions concerning the provisions of Paragraph 374. Their views upon the third of these questions appear from the opinions upon the Governor's questions above set forth. Their views upon the other two are set forth below.
Whether the provisions of Paragraph 374 apply to the Justices of the Supreme Court as now constituted.
Upon this question the opinions of the Chief Justice and of Justice Wolcott are as follows:
The provisions of Paragraph 374 relating to advisory opinions are set forth above.
In the light of the recent constitutional amendment (47 Del.Laws Ch. 177) creating a separate Supreme Court consisting of a Chief Justice and two Associate Justices, *134 how shall this statute be interpreted? Is it to be given the literal meaning apparent on its face or may it be given a meaning inconsistent with its language but in accord with its fundamental purpose and intent?
The applicable principles of statutory construction here pertinent are sufficiently elementary. If the words of a statute are clear and unambiguous and if their meaning is consistent with the underlying intent of the statute, there is no room for construction. In such a case it is the duty of a court (and it would be our duty here) to accept the language of the statute as embodying the legislative will. Nigro v. Flinn, 8 W.W.Harr. 368, 376, 38 Del. 368, 376, 192 A. 685, and cases cited. On the other hand, the literal meaning of a statute is not to be followed when it departs from the true intent and purpose of the statute and to conclusions inconsistent with the general purpose of the act. Darling Apartment Co. v. Springer, 25 Del.Ch. 420, 431, 22 A.2d 397, 137 A.L.R. 803. The difficulty here, as always, lies in the application of these principles.
Let us examine the history of the statute in the light of the organization and development of the judiciary, bearing in mind that the duty to give advisory opinions is a non-judicial one, and that such opinions have no binding effect as adjudications. State ex rel. Satterthwaite v. Highfield, 4 W.W.Harr. 272, 34 Del. 272, 152 A. 45. "The Duty of Judges as Constitutional Advisers", 24 Am.Law Rev. 369. The present statute derives from an Act of Assembly of January 17, 1832 (8 Del.Laws, Ch. 106), which was an act to carry into effect the Constitution of 1831. Section 9 of that act reads as follows:
"And be it further enacted by the authority aforesaid, That it shall be the duty of the chancellor and judges, whenever the Governor shall require it for public information, or to enable him to discharge the duties of his office with fidelity, to deliver to him their opinions in writing, touching the proper construction of any provision in the constitution of this State or of the United States, and touching the constitutionality of any law enacted by the Legislature of this State."
Under the Constitution of 1831 the judicial power of the State was vested in a Court of Errors and Appeals, a Superior Court, a Court of Chancery, an Orphans' Court, a Court of Oyer and Terminer, a Court of General Sessions of the Peace and Gaol Delivery, a Register's Court, Justices of the Peace and such other courts as the General Assembly might establish. To compose the courts of general jurisdiction five judges were provided for  a Chancellor, a Chief Justice and three Associate Judges. (Art. VI, Secs. 1 and 2.)
The Constitution of 1831, unlike the Constitution of 1792, did not contain a clause declaring that the high Court of Errors and Appeals should consist of the Chancellor and the judges. (See Constitution of 1792, art. VII, Sec. 1.) It did, however, contain in Section 7 a provision for certification of questions of law from the Superior Court to the Court of Errors and Appeals, in which case the Chancellor and the four judges were to compose the Court of Errors and Appeals.
By the Constitution of 1897 an additional office of associate judge was created, but as before the Chancellor and associate judges discharged both trial and appellate functions, and the adoption of that Constitution created no problem of interpretation of the statute requiring advisory opinions from "the Chancellor and Judges".
The adoption of the 1951 amendment to the judiciary article, however, has raised a difficult question. The Chancellor and judges are now primarily trial judges, and appellate duties are performed by three justices constituting a separate Supreme Court. To which group of judges does the advisory function belong? The General Assembly of 1951 did not undertake to resolve this question by legislation; nor did it undertake to deal with other statutes (hereinafter referred to) similarly imposing various non-judicial functions upon members of the judiciary. The problem is thus presented of fitting into the new constitutional scheme statutes of this kind, enacted prior to the division of the trial and appellate *135 functions of the judges composing the courts.
An examination of the Delaware statutes shows that from early times the General Assembly has frequently imposed upon the members of the State judiciary duties of a non-judicial nature, and further shows that in imposing such duties it has designated in many different ways the judges who are to discharge such duties. Sometimes the statute has referred to them as judges of a particular court, e. g., "judges of the Court of General Sessions";[4] "the associate judges of the Superior Court";[5] "the Judges of the Superior Court and the Court of General Sessions * * * residing in New Castle County";[6] "the Judges of the Supreme Court";[7] and "the judges of the Court of General Sessions".[8] Sometimes the statute has referred to the courts by name alone, e. g., "The Court of General Sessions * * * in and for Sussex County";[9] "The Superior Court";[10] and "The Court of General Sessions".[11] In one case the duty is imposed upon "the Law Judges of the State".[12] Sometimes a single judge is designated by his title, e. g., "the Chief Justice"[13] or "the Associate Judge of the Superior Court, resident in New Castle County".[14] In one case the statute designates "The Chancellor, Chief Justice and Associate Judges";[15] and in the statute here considered the phrase is "the Chancellor and Judges".
It is a fair conclusion, we think, that in designating the members of the judiciary to perform non-judicial duties no consistent pattern has been followed in the language employed for the purpose. This much, however, may be said. In some cases where the duty to be performed is local in nature (see notes 3 and 5) or bears some relation to the duties of a trial judge (see notes 5 and 7) the reference is to a trial court or the judges who constitute it; in some other cases where the duty is a state-wide function, or one calling for the performance of a duty appropriate to members of the highest court (see note 4), different language is used in apparent recognition of the difference in the nature of the function.
Particularly to be noted are the two statutes (see note 4) mentioning the "Judges of the Supreme Court", although the Constitution of 1897 (like the Constitution of 1831) does not explicitly establish a Supreme Court consisting of all the judges. The reference is obviously to the members of the judiciary qualified to sit in the highest court. The phrase in these statutes is thus the equivalent of the phrase "the Chancellor and Judges" appearing in Paragraph 374, and it is reasonable to say that in all three cases the intent of the General Assembly was the same.
In the light of the varying language of the statutes, we think that the problem of statutory interpretation created by the adoption of the constitutional amendment should be resolved, in the case of Paragraph 374, by construing the statute in accordance with the basic intent of the act, provided that intent be clear and if adherence to a *136 literal reading would produce an anomalous result.
The statute before us requires the giving of advisory opinions by "the Chancellor and Judges". Certainly at the time of the adoption of the Act of 1832 it was the intention that advisory opinions to the Governor should be given by those members of the judiciary highest in rank.
Constitutional and statutory requirements for the giving of advisory opinions to the executive by members of the judiciary are or have been from time to time in existence in several other states of the Union. From the opinions in other states that have been called to our attention it would appear that the members of the judiciary from whom they are required are those highest in rank in the judicial system. It would be anomalous to require the executive to accept an advisory opinion from members of the judiciary of lower rank. As has been said, an advisory opinion of the kind required by our statute is not a judicial act, and such persuasiveness as it has rests solely in any weight that may attach to it as emanating from the individuals constituting the State's highest judicial officers. We think it clear that the underlying intent of the General Assembly at the time of the adoption of the Act of 1832 was to accord to the Chief Executive the right of calling upon the highest judicial officers of the State for an advisory opinion, and that the phrase "the Chancellor and Judges" appearing in Par. 374 should continue to be given an interpretation consistent with that intent, that is, that the words should be understood to mean "the members of the highest court of the State". Such a result achieves harmony between the new Constitutional scheme and the older statute.
In reaching this conclusion we have been mindful of the fact that we are not performing the ordinary function of a court in settling rights of litigants. To depart from the literal meaning of a plain and (on its face) unambiguous phrase in a statute is rarely permissible; certainly in cases involving private rights such a construction must be resorted to with the greatest caution. Cf. United States v. Goldenberg, 168 U.S. 95, 18 S.Ct. 3, 42 L.Ed. 394. Our problem here at the moment is of a different nature; it is nothing more than to determine the allocation of an administrative duty.
Moreover, the conclusion above reached does not involve, we think, any objectionable reach on the part of the judiciary for an expansion of powers. Since the giving of the opinion fixes no legal rights and entails no legal consequences, it involves no exertion of power over any person; it is merely the performance of an advisory function. For the members of the present court to decline to perform this duty would appear to be an unjustified insistence upon the letter of the law and a disregard of its spirit and purpose.
We may add that examples are not wanting, even in the adjudication of private rights, of judicial substitution in a statute of words conforming to its underlying intent. In the case of Murray's Lessee v. Baker, 3 Wheat. 541, 4 L.Ed. 454, the Supreme Court of the United States had before it a question certified by the court below as to the construction of a statute of limitations for the State of Georgia tolling the statute in favor of persons "beyond seas". This phrase, which apparently had been borrowed from an English statute, was construed to be the equivalent of "without the limits of the State". And see 2 Sutherland, Statutory Construction, Sec. 4925, where it is said:
"A large majority of the cases permit the substitution of one word for another where it is necessary to carry out the legislative intent."
In the present matter this principle may the more readily be applied to the statute here considered, since if we were to decline to answer the Governor's questions we might omit, in the view of the General Assembly, the performance of a duty which we think it was its intention to cast upon us.
We are of opinion that the provisions of Paragraph 374 are applicable to the Justices of the present Supreme Court.
Upon this question the opinion of Justice Tunnell is as follows:
*137 While I am quite prepared to concede that the justices of this Court may be referred to generically as "judges", I cannot go so far as to agree that we are "The Chancellor and Judges". When the recent change was made in the membership of the State's highest court, the legislature left the advisory opinion statute unchanged either because of oversight or deliberately. Perhaps it was oversight, but even if it was, no other instrumentality has a right to supply amendments simply because they ought to have been made. Such action is within the exclusive prerogative of the General Assembly.
On the other hand, if the omission was actually deliberate, and the legislative intent was to leave the advisory function in the Chancellor and judges, the question is similarly answered. It is not as if we no longer had members of the bench who could be referred to as "the Chancellor and Judges". No reason has been suggested why the Chancellor and judges should not render this advice to the executive if it is found to be the will of the legislature that they should. No principle of law would be offended. And who knows but that it was felt, for example, that since the Chancellor and judges were now to be relieved of the burden of appellate duties, it would be well to leave them with the advisory function? After all, our own advisory opinions are no more binding upon courts, even upon our own court, than theirs would be.
But this does not mean that I disapprove of the giving of an advisory opinion. I agree with my colleagues that the advisory function is distinctly non-judicial, and this conclusion opens up for me the freedom of action which is appropriate for personal relationships, though, of course, inappropriate for duties of a judicial nature. Certain circumstances here make it desirable for us to give the opinion.
The governor saw fit to address his inquiries to us. Some time has now elapsed since he did so. All phases of the problem, including, of course, this one, have been studied by us and argued before us by able counsel. While it seems clear to me that we are not the individuals governed by Paragraph 374, it does not so appear to my colleagues, and, therefore, it could easily happen that if we should decline to answer the governor because we deemed the statute to refer to the trial judges, they, in turn, might come to the conclusion that they should not answer because they consider the statute to refer to us.
Now one thing, at least, is clear. There was a legislative intent to give the governor of this State the benefit of an advisory opinion, within the limitations laid down in the statute, from some branch of the judiciary. Since all are agreed that the nature of the advisory function is non-judicial, I cannot consistently make a great point of refraining from such an opinion, especially when the practical considerations above enumerated make it desirable for one to be given. Even though I do not deem the statute to put us under any compulsion, there is nothing to stop us from acting voluntarily. In this instance expediency and courtesy seem to require such voluntary action.
Therefore, I here record that, with the exception of the one matter herein discussed, I concur in all respects in the advisory opinion this day submitted by our Chief Justice and agreed to by Justice Wolcott.
Whether the provisions of Paragraph 374 are constitutional.
Upon this question the opinion of all the Justices is as follows:
The answer to this question depends upon the extent to which the doctrine of separation of powers is and has been recognized by the Constitution of Delaware; that is, the doctrine that the government of the State is divided by the Constitution into three departments, legislative, executive and judicial, and that the powers and duties of one department may not be exercised by either of the others.
It is first to be observed that the present Constitution of 1897, like its forerunners, contains no provision expressly declaring that the three departments of government shall be kept separate, or forbidding the performance of the functions of one by *138 any of the others, such as it found in the constitutions of certain of our sister states. It is quite true that, broadly speaking, the doctrine of separation of powers is fundamental in American constitutional law, Cooley, Constitutional Limitations, Ch. V, p. 175, and our courts have affirmed that from the beginning our state government has been divided into the three departments, legislative, executive and judicial. State ex rel. Biggs v. Corley (Ct. in Banc 1934), 6 W.W.Harr. 135, 144, 36 Del. 135, 144, 172 A. 415, 419. It is not true, however, that the doctrine of separation of powers has been adhered to with theoretical rigor. On the contrary, the Constitutions of 1792 (art. VIII, Sec. 3) and 1831 (art. II, Sec. 16) provided for the exercise of certain executive powers by the General Assembly, and under the present constitution the General Assembly may exercise the power of appointment to office. State ex rel. Morford v. Emerson, 1 Terry 233, 40 Del. 233, 8 A.2d 154, affirmed on opinion below, 1 Terry 496, 40 Del. 496, 14 A.2d 378. Moreover (and more to the point here), the Constitution of 1897 expressly requires the performance by the members of the judiciary of the duty  chiefly administrative  of canvassing election returns. Art. V. Sec. 6. The inference may be drawn that partial relaxation of the doctrine of separation of powers is not repugnant to the will of the people; and it would therefore appear to follow that the limitation implied therefrom upon the plenary powers of the General Assembly should not be too strictly applied.
The power of the legislature, in the absence of a constitutional provision, to require by statute advisory opinions from the judges of the courts has been denied in certain cases. The numerical weight of authority is to that effect. See In re Constitutionality of House Bill No. 222, 262 Ky. 437, 90 S.W.2d 692, 103 A.L.R. 1085; In re Opinion of the Justices, 1949, 115 Vt. 524, 64 A.2d 169; In the matter of the Application of the Senate, 10 Minn. 78, 10 Gil. 56. On the other hand, such a statute in Alabama has been upheld. In re Opinions of the Justices, 209 Ala. 593, 96 So. 487.
The diversity of the holdings in these cases has not resulted from any disagreement as to the nature of the function of judges in giving advisory opinions. We find no dissent from the general rule announced in State ex rel. Satterthwaite v. Highfield, supra, 4 W.W.Harr. 272, 34 Del. 272, 152 A. 45, that it is a non-judicial function. But from this fact varying conclusions have been drawn. In the Kentucky case the Court of Appeals took the view that under the state constitution, which provides that it "shall have appellate jurisdiction only," Const. § 110, the legislative attempt to confer additional powers was in contravention of that provision. The reasoning of the other cases applies the doctrine of the separation of powers. In Vermont that doctrine is expressly written into its constitution, which provides that the three departments of government "shall be separate and distinct, so that neither exercises the powers properly belonging to the others." Ch. II, Sec. 5; 64 A.2d 172. A similar prohibition would appear to have furnished the ground of the holding in Minnesota, 10 Minn. 78, 10 Gil. 57. On the other hand, the justices of the Supreme Court of Alabama, notwithstanding a similar express prohibition against the exercise of the powers of one department of government by another (Constitution of Alabama of 1901, Secs. 42 and 43), were of opinion that the performance of non-judicial functions by the members of the judiciary is to be distinguished from the performance of duties conferred on the court as such within the sphere prescribed in the Constitution; and held that the conferring of such non-judicial functions is not violative of the constitutional principle of separation of powers. Declining to follow the views expressed in the Minnesota case, supra, that non-judicial functions may not be conferred on the members of a court, the justices of the Supreme Court of Alabama cited with approval the prior decision of that court in Fox v. McDonald, 101 Ala. 51, 13 So. 416, 21 L.R.A. 529, 46 Am.St. Rep. 98, upholding the constitutionality of a statute requiring a county probate judge to appoint a board of police commissioners for the City of Birmingham. That opinion *139 recognizes, as the opinions to the contrary fail to do, that from the earliest times in this country, the functions of the three departments of state governments have been to some extent intermingled, and the theoretical distinction between them has never been observed in practice with literal rigor.
Which line of reasoning leads to the conclusion more consonant with constitutional and statutory development in Delaware?
When we examine the legislation in our State conferring non-judicial powers and duties upon members of the judiciary, we find that from early times the judges of the courts have been required to perform executive and administrative duties of the most varied nature. From colonial times on, the Court of Quarter Sessions or the Court of General Sessions has from time to time been required to hear and make recommendations to the Governor with respect to applications for tavern licenses. See 1 Del.L. Ch. 75 (13 Geo. II); 2 Del.L. Ch. 20 (1793); 8 Del.L. Ch. 208 (1833); 1852 Code, Ch. 53. Another early example of non-judicial duties conferred upon members of the judiciary is the Act of February 15, 1814 (5 Del.L. Ch. 23), authorizing the Court of General Quarter Sessions for Sussex County to appoint trustees for the lands at Cape Henlopen. Many other instances are set forth in the preceding part of this opinion and are not repeated here. Others could be added, but these are sufficient to establish the existence of a practice, extending back at least a century and a half, under our three constitutions, of requiring the members of the judiciary to perform non-judicial duties  in most cases duties wholly unrelated to the courts or to the judicial function. We are cited to no decision of any Delaware court denying or even questioning the power of the General Assembly in this regard. Of especial significance is the fact that questions calling for advisory opinions of the Chancellor and judges have in the past been propounded by the Governor, and, so far as can be known, have been answered. In one instance, that of In re School Code of 1919, argument was had before the Chancellor and judges and briefs were filed by able counsel (eight in number) and the opinion given was reported. See 7 Boyce 406, 108 A. 39. No question of constitutionality of the advisory opinion statute was suggested.
The chain of legislative enactments above mentioned over a very long period of time affords a practical construction, by the people of the State through their representatives, of the doctrine of separation of powers under our constitutions  a construction reinforced by the apparent tacit recognition by bench and bar of the validity of the advisory opinion statute.
We think it a fair conclusion that, notwithstanding the existence of the doctrine in our State, and conceding that in some instances it might well be a curb upon the legislative powers of the General Assembly, it cannot be availed of to strike down the provisions of Paragraph 374. With the policy underlying the act, which has often been criticized in other states,[16] we have no concern. It may be observed, however, that the dangers to popular government to be apprehended from an intermingling of the functions of the three departments seem to be of least gravity in the case of the performance of minor executive or administrative duties by members of the judiciary  traditionally the weakest of the three departments of government.[17]
In the light of the foregoing, the conclusion reached by the Supreme Court of Alabama seems to us more persuasive than that reached in the other cases in Minnesota and Vermont. The holding in the Kentucky case that the statute requiring advisory opinions conflicts with the exclusively appellate jurisdiction of the court appears to be based upon the implicit assumption that the statute is an attempt to enlarge the jurisdiction of the court qua court. This assumption we think unsound for the reasons already stated, viz., that members of the court delivering advisory opinions do not act as a court and hence do not exercise the judicial power, which has been defined to be the power to hear, *140 determine and enforce. 14 Am.Jur. p. 364. Under our statute they act only as advisors to the Chief Executive. See 88 A.2d 134, supra.
One further point, mentioned at the argument, should be noticed. It is suggested that the statute invades the constitutional duties and prerogatives of the Attorney General, who is a constitutional officer (art. III, Sec. 21), whose duty it is to represent the State and its departments in litigation and to advise the executive and other State officers and agencies when called on for legal advice. That the common law powers and duties of the office are in many respects subject to alteration by the legislative power is impliedly recognized in Darling Apartment Co. v. Springer, supra. See especially the concurring opinion of Judge Rodney, 25 Del.Ch. 436, 443, 22 A.2d 404, 407. We do not think the statute invalid as encroaching on the Attorney General's constitutional sphere of action.
For the foregoing reasons we are of opinion that the provisions of Paragraph 374 of the 1935 Revised Code are constitutional.
All of which is respectfully submitted.
 CLARENCE A. SOUTHERLAND
 Chief Justice.
 DANIEL F. WOLCOTT
 JAMES M. TUNNELL, Jr.
 Associate Justices.
NOTES
[1] The omitted portions of the section concern the adoption of rules by the judges of the Supreme Court, and are not here pertinent.
[2] See the Debates of the Constitutional Convention, Vol. 3, pp. 1301, 1451.
[3] Art. IV, Sec. 28, not amended until 1935, when it was shortened to six months. 40 Del.L.Ch. 2.
[4] 1852 Code, Sec. 924, relating to the granting of tavern licenses.
[5] 1852 Code, Sec. 878, constituting them trustees for the indigent blind. See also 1935 Code, Sec. 3058 "The Judges of the Superior Court".
[6] 1935 Code, Sec. 4141, relating to appointment of trustees of the New Castle County Workhouse.
[7] 1935 Code, Secs. 26 and 27, relating to the State Library; and Sec. 4152, relating to the Board of Parole.
[8] 1852 Code, Sec. 924, relating to the granting of tavern licenses.
[9] 1852 Code, Sec. 16, relating to the appointment of trustees for "the Cape".
[10] 1852 Code, Sec. 1540, relating to licenses to import or export slaves.
[11] 1852 Code, Sec. 1002, and 1935 Code, Sec. 4175, relating to the appointment of fence viewers.
[12] 1935 Code, Sec. 4723, relating to the appointment of jury commissioners.
[13] 1935 Code, Sec. 913, relating to the Medical Council; and Sec. 1605, relating to the Old Age Welfare Commission.
[14] 1935 Code, Sec. 2410, relating to the appointment of a deputy judge of the Municipal Court.
[15] 1935 Code, Sec. 4254, relating to certain county law libraries.
[16] See authorities discussed supra, 88 A. 2d 138.
[17] See the discussion in "The Federalist", No. 78.