In re the Matter of DIVISION OF FAMILY SERVICES, Petitioner,

v.

Connie SMITH,[1] Respondent,

Larry Holden, Respondent.

In the Interest of Anthony Smith, DOB: 08.24.04.

No. CS04–02846.
Petition Nos. 03–29157, 05–16440.

Family Court of Delaware, Sussex County.

Submitted: Sept. 26, 2005.

Decided: Nov. 18, 2005.

---

**1.** Pseudonyms have been used to protect the litigants and their personal acquaintances.

Margaret R. Cooper, of Fuqua & Yori, P.A., Georgetown, DE, Michael F. McGroerty, of Michael F. McGroerty, P.A., Seaford, DE, for Respondent Connie Smith.

Bruce A. Rogers, of Bruce A. Rogers, P.A., Georgetown, DE, Kim DeBonte, of Kim DeBonte, P.A., Georgetown, DE, for Respondent Larry Holden.

James Reichert, Deputy Attorney General, Georgetown, DE, for Petitioner.

## OPINION

HENRIKSEN, Judge:

On September 26, 2005, the Court held a hearing that contained many dependency/neglect issues as they related to the above-named child. The two key issues, which will be more fully explained hereafter, are (1) will the date of the taking of the child into DFS care be considered the date of an original taking on November 18, 2004, or a later date of May 24, 2005, and (2) where the Division has established that Cathy Smith's ("Mother") parental rights have previously been involuntarily termi-

nated in two other children, does the Division become the sole arbiter of whether or not to offer reunification services to Mother.

This child in the present case was originally taken into care on November 18, 2004. At a preliminary protective hearing on March 21, 2005,[2] both parents waived their right to a hearing by acknowledging that there exists sufficient probable cause for the Court to find the child dependent. Larry Holden ("Father") waived his preliminary protective hearing based upon inadequate housing, but without prejudice, allowing the Division to later amend with other grounds. Mother waived her preliminary protective hearing based upon inadequate income and housing, but also without prejudice to enable the Division to similarly amend with other grounds.

The original taking of the child into care on November 18, 2004 eventually led to a hearing held on May 23, 2005.[3] At that hearing, an adjudicatory finding was entered against Father because of his default in appearance. After holding both an adjudicatory hearing and a substantiation hearing against Mother, the Court found that the Division of Family Services failed to meet its burden of proof to merit substantiating Mother at Level I on the Child Abuse Registry. The Court also found that the Division had failed to meet its burden of proof to make an adjudicatory finding of dependency and/or neglect against Mother. The Court therefore directed that custody of the child be returned immediately to Mother.

The very next day, late in the afternoon of May 24, 2005, the Court granted a verbal telephone Emergency Order to the Division of Family Services, again ordering the child into the Division's care. Following the second taking of the child on May 24, 2005, the Court held a preliminary protective hearing as to Mother on June 6, 2005, at which time Mother agreed that there exists sufficient probable cause because of her incarceration and her need to complete a violation of probation Cornerstone program. Again, the Division reserved the right to pursue a finding of dependency and/or neglect against Mother on other grounds including, but not limited to, housing, employment, mental health, and substance abuse allegations. Because Father had not been served with notice of these latest proceedings, his preliminary protective hearing was scheduled for a later date.

Following the second emergency taking of the child on May 24, 2005, and just prior to the June 6, 2005 preliminary protective hearing on the second taking, the Division timely filed a Motion to Reargue, Alter or Amend the Court's earlier findings made on May 23, 2005, where the Court ordered that the child be returned to Mother. After considering the merits of the Division's Motion, the Court, in its Order dated July 11, 2005 declined to reopen that part of the Court's prior decision wherein the Court held that the Division had failed to substantiate Mother at Level I on the Child Abuse Registry. However, the Court de-

---

**2.** The preliminary protective hearing, which, pursuant to Delaware Family Court Civil Procedure Rule 212 is normally held within 10 days of the date the child is taken into state care, was considerably delayed because the prison facility where Mother was incarcerated failed to transport Mother on at least two occasions.

**3.** Delaware Family Court Civil Procedure Rule 213 requires the adjudicatory hearing to be scheduled within 30 days of the entry of the preliminary protective order. Rule 202 permits extensions of time for good cause. The adjudicatory and substantiation hearing was not scheduled until May 23, 2005, since this was the first available date that all participants could be present.

termined that the Division had made an appropriate showing to justify reopening the dependency/neglect adjudicatory issue because there was a strong possibility that Mother had not been truthful with the Court in some of the testimony she gave at the hearing held on May 23, 2005. The Court's decision to reopen its prior adjudicatory finding emphasized the considerable importance that the Court had previously placed on Mother's testimony about her lack of drug use for several months, as well as Mother's testimony that she was maintaining control of her mental health problems and remaining sober and stable. The Court relied heavily on Mother's testimony in making its final decision to rescind the custody of the Division and return the child to Mother.

As a result of the foregoing events, the Court's hearing held on September 26, 2005 had at least three purposes. First the Court was prepared to conduct a dispositional review hearing to consider the Division's reunification case plan with Father, having previously determined that the initial adjudicatory default finding against Father in the Court's May 23, 2005 Order was binding as to Father.

Second, the Court was prepared to determine whether the Division could prove by a preponderance of the evidence (an adjudicatory finding) that the child was dependent and/or neglected as to Mother by reason of the recent taking of the child into the State's care on May 24, 2005.

Third, having granted reargument on its dependency/neglect adjudicatory finding of the hearing held on May 23, 2005, the Court was going to hear testimony at the September 26, 2005 hearing to consider whether the Division could prove by a preponderance of the evidence that the child was dependent and/or neglected as to Mother based upon the original taking of the child into the State's care on November 18, 2004. The consequence of the Court's determination as to which date the child originally came into DFS care, November 18, 2004 or May 24, 2005, would directly affect time requirements that are mandated by the federal Adoptions and Safe Families Act of 1997(ASFA)[4], as well as the Delaware Family Court Rules relating to dependency/neglect cases.[5] If the Court changed its earlier decision and made an adjudicatory finding that the child was dependent and/or neglected in Mother's care as of the original date of taking the child into care on November 18, 2004, the Division could more quickly move towards a permanency goal for this child, whether that be reunification with Mother, guardianship with another suitable relative, or, given the young age of this child, a termination of parental rights with the subsequent adoption of the child.

Appearing for the September 26, 2005 hearing were Ramona Doyle and Christie Johnson of the Division of Family Services, represented by James S. Reichert, Esquire; Mother, presently incarcerated, and represented by Michael F. McGroerty, Esquire; Perry Hood, the CASA, represented by Kristin S. Gibbons, Esquire; and Kim DeBonte, Esquire, who was prepared to represent Father. Unfortunately, despite proper notice, Father failed to appear. During the hearing, the Court also heard testimony from Kathy Newquist of Children and Families First; Jessica Atkins, a probation and parole officer with the Delaware Department of Corrections; and Nicholas Feil, a senior counselor at Baylor Women's Correctional Institution. Mr. Feil participated by telephone.

4. 42 U.S.C. 675(5)(c).

5. Del. Fam. Ct. Civ. R. 21b.

As already noted, Father failed to appear. Ms. DeBonte, his attorney, reported to the Court that her attempts to contact Father about the hearing failed. She sent letters to his last known address. She also attempted to contact him by telephone. Kathy Newquist had also tried to contact Father, but to no avail. Ms. Newquist had sent letters to Father on July 20, 2005, and again on August 2, 2005, requesting to meet with him. When she called a telephone number Father had given her, Ms. Newquist was informed by a person who identified herself as Father's Mother that Father had received the letter and he intended to call Ms. Newquist. Division records indicated that Father did call the Division on July 21, 2005 and left a message, but Father never called back. Christie Johnson, a treatment worker with the Division, also attempted to contact Father. According to Ms. Johnson's testimony, the only time Father has seen the child was during a visit on March 14, 2005. By reason of Father's failure to appear at this hearing, coupled with his failure to avail himself of the opportunities offered by the Division and Ms. Newquist, it would be unreasonable to expect the Division to make reasonable efforts at this time towards reunification between the child and Father. Certainly, however, if Father should change his attitude and demonstrate his intention to seek reunification, Father must promptly contact the Division. At that point, the Division shall offer efforts towards reunification between Father and the child.

At the September 26, 2005 hearing, Mother conceded that the child was dependent when the child was taken by the Division on May 24, 2005, as Mother knew she was about to be arrested for a violation of probation. Through the testimony of Mr. Feil, the Court learned that Mother was sentenced on June 3, 2005 for two violations of probation. On one violation,

Mother received three years at Level 5 (which, in Delaware, means incarceration), suspended to Level 3 (which, in Delaware, means intensive supervision) upon her acceptance into an eighteen-month program at Cornerstone. On the second violation, Mother was sentenced to two years at Level 5, and, again, suspended to Level 3 upon acceptance into the Cornerstone program. Unfortunately, Mr. Feil was somewhat new in his position and knowledge of the Cornerstone Program. Jessica Atkins, the probation and parole officer, explained that Cornerstone was a residential treatment program. Although described as a Level 3 program of intensive supervision, Ms. Atkins noted that Mother was not free to leave. Ms. Atkins believed that the Cornerstone program lasted from four to nine months and consisted of three phases. No one was able to tell the Court, with certainty, exactly how long Mother might be detained in the program. Certainly, the second taking of this child on May 24, 2005 was appropriate.

The Court is concerned, however, with Mother's decision to use crack-cocaine the day before she attended the first adjudicatory hearing. This is a mother who admitted to having a long history of drug abuse. This is a mother who also admitted to having a long history of mental health issues. Mother had to know that the hearing the Court held on May 23, 2005 could result in her young child being returned to her. And yet, knowing of the importance of this day, Mother chose to use drugs over the chance to be reunited with her child. In the Court's opinion, Mother's decision constituted neglect.

Consequently, the Court now turns to the more difficult decision regarding reconsideration of its earlier adjudicatory finding on May 23, 2005, which allowed the child to return to Mother, and

which was based upon the original taking of November 18, 2004. In summary, the original allegations set forth in the Emergency Petition filed by the Division on November 18, 2004 stated the following:

1. Mother was involved in a domestic violence incident with her paramour, Wendall "Butch" Millner, while holding her child. Mother had acknowledged an extensive history of domestic violence between she and Mr. Millner.

2. Mother has had two prior involuntary terminations of her parental rights.

3. Mother has had a history of drug abuse. According to the allegations, Mother had admitted to recent use of cocaine and marijuana, having had multiple relapses in the past, and that she was not currently undergoing treatment.

4. Mother had a history of mental illness. The allegations indicated that Mother said she was presently on Zoloft, was not in therapy, and was considering giving away her baby. Mother also stated she was depressed.

At the preliminary protective hearing on March 21, 2005, Mother waived a finding of probable cause of dependency based upon inadequate income and housing, but without prejudice to other grounds the Division might raise.

At the hearing on May 23, 2005, the Court found just cause to excuse Mother's involvement in a domestic violence incident with her paramour, while she was holding her child. The Court reasoned that Mother was doing what was necessary to protect her child from a perpetrator of domestic violence where Mother, herself, was the victim. While the Court finds this separate incident to have been justified by Mother, in retrospect, if the Division had

proved that there had been an extensive prior history of domestic violence between Mother and Mr. Millner, the Court would have questioned why Mother had even put her child at risk in the first place.

The Division clearly proved that Mother had already lost her parental rights in two other children by reason of involuntary terminations.

The Court next looks at the very critical allegation of Mother's history of drug use, and her continued use thereof. As of the original emergency taking on November 18, 2004, the Division alleged that Mother had admitted to using cocaine and marijuana only two weeks before the child was taken into DFS custody. Mother did not rebut the testimony of DFS worker Tammy Sneller. Ms. Sneller testified at the May 23, 2005 hearing that Mother had admitted to having a history of alcohol and drug abuse, that Mother had used cocaine just two weeks before the child was taken into DFS custody, and that Mother was consuming a quarter bag of marijuana a week. At some point following the child being taken into care on November 18, 2004, Mother was incarcerated. Mother was released from incarceration on February 28, 2005.

On May 23, 2005 Mother testified that since she had been released from incarceration, she had been seeing her probation officer, Officer Davidson, every Tuesday. When the Court asked Mother whether she had been undergoing random urine screens, she told the Court that the probation officers do test urine samples, but that her probation officer had not tested her. Mother told the Court that she was attempting to get services for her mental health and substance abuse problems and that her probation officer was trying to assist her. Indeed, the testimony given by Officer Atkins at the September 26, 2005

hearing supported Mother's testimony that she was attempting to get help. According to Ms. Atkins' review of Mother's probation file, on March 14, 2005, Mother's probation officer made a referral to Sussex Mental Health to see if Mother would qualify for the program. Unfortunately, no directive was ever issued to place Mother into such a program. On May 3, 2005, Mother's probation officer Mother's probation officer recommended that Mother contact Brandywine Counseling. It appears that Mother contacted Brandywine Counseling on May 4, 2005. Mother intended to go to an appointment on May 26, 2005 but she was unable to make that appointment because she was again incarcerated.

According to Mother's testimony on September 26, 2005, when she left the prison on February 28, 2005, she was given an unknown quantity of pills that she was told to take to treat her mental health issues. Mother indicated that she did not take these pills every day even though she knew she should. In fact, she often failed to take the medication.

The Court's Order of July 11, 2005, which reopened the adjudicatory hearing, stated, *"The Court also placed great emphasis on Mother's testimony that she was maintaining control of her mental health problems, remaining sober, and remaining stable."* Having gone back and reviewed the recorded testimony of that proceeding, the Court must correct that statement. Mother did not necessarily mislead the Court with statements that she was maintaining control of her mental health issues and remaining stable. Instead, a review of Mother's testimony and the testimony of others given at that hearing demonstrated that Mother had been out of prison for approximately three months, recognized that she had a diagnosis of Bipolar Disorder, considered her depression to be part of her Bipolar Disor-

der, and understood that a doctor at one time told her she might suffer from schizophrenia. Mother told the Court of her and Officer Davidson's efforts to secure her placement into various programs, and these statements appear to have been accurate. Mother also told the Court she had a drug treatment appointment for the Thursday following the hearing. Although the Division's attorney made the point that Mother had been out of prison for three months, knew she had problems, and had not sought expert assistance for her drug and mental problems, there was no clear proof that Mother was not trying to get help. According to Mother, while under her present incarceration, Dr. Josie has prescribed medications which Mother indicated were Risperdal, Zoloft, and Depakote. Mother did not know the reason for the medications. She simply took the medications because she had been told to do so by Dr. Josie.

In the Court's July 11, 2005 Order, which reopened its adjudicatory finding of May 23, 2005, the Court also noted, *"A strong possibility that Mother was not truthful with the Court about her drug use. The Court placed considerable importance on Mother's testimony in this area."* Having heard the testimony of Jessica Atkins as well as Mother's admission, it is clear that Mother falsely testified concerning her drug use. The Court reviewed the recording of the hearing held on May 23, 2005. In reviewing Mother's testimony, Mother admitted to the Court to having taken two puffs on a joint when she was released from prison in February of 2005. The Court then asked, *"Have you been using?"* Mother responded, *"No, sir."* At that time, no question or answer was more important to this Court's decision in awarding Mother's child back to her. Because probation officer Davidson had not tested Mother since her release, there was no evidence available to

the State to prove or disprove the status of Mother's drug use. Division worker Sneller's testimony demonstrated that Mother had been using drugs up to the date the child was taken into care on November 18, 2004. However, there was no evidence to suggest that Mother had thereafter continued using illegal drugs. Furthermore, evidence suggested that Mother had received some type of assistance during her incarceration which extended past her release as she was sent home with psychotropic medication to assist her with her mental health issues. Whether or not Mother was attempting to receive assistance for her drug problem and mental health issues was extremely vague. Indeed, the testimony of Jessica Atkins indicated Mother was making some attempts. Mother testified that she had been able to abstain from the use of illegal drugs since her release from prison near the end of February 2005 until almost three months later up to the hearing on May 23, 2005. Mother's false testimony wrongly gave the Court hope that Mother was indeed struggling in a course of recovery which did not justify the taking of her child. Had Mother answered truthfully about her use of illegal drugs, the Court would not have harbored such a hope and would have kept the child in the custody of the Division.

The testimony from the September 26, 2005 hearing provided further clarification to what the Court now realizes was Mother's extreme instability in housing. Although these grounds were never raised in the original allegations of the Division, the issue of inadequate housing was raised by Mother's own counsel at the preliminary protective hearing on March 21, 2005. At that hearing, Mother waived her preliminary protective hearing based upon probable cause of her inadequate income and inadequate housing. In fact, having reviewed the tape of the hearing on May 23, 2005, the Court agrees with the position taken by Mother's attorney in Paragraph 5 of her Answer to the Motion for Reargument wherein it is stated, *"The issue of residency was simply not fully explored in the hearing."* When asked on May 23, 2005 by the Division's attorney whether Mother had housing, Mother stated that she was staying in Belltown with her boyfriend and that she was on a waiting list to move into Unit 5 of the Georgetown Apartments where she would hopefully move within one month. However, the Court learned at the present hearing on September 26, 2005 that, while Mother may have had a roof to sleep under that particular evening, Mother's housing was certainly not stable housing. According to Officer Atkins, Mother reported to Ms. Atkins on May 17, 2005 that she was living in Belltown with her boyfriend, Anthony Riley. On May 24, 2005, Mother provided her probation officer with the same address. Mother had been dating Mr. Riley for approximately two months. DFS worker Doyle, however, found Mother at a Pine Ridge Drive residence in Milton, Delaware on May 24, 2005, the day after the hearing. The Belltown address and the Pine Ridge Drive address are two entirely different homes which the Court estimates to be at least 20 minutes apart from each other by automobile. Ms. Doyle observed that all of the child's clothing and formula, Mother's clothes, and Mother's phone were located at the Pine Ridge Drive residence. Indeed, Christie Johnson, the DFS worker who returned the child to Mother on the evening of May 23, 2005, returned the child to Mother at the Pine Ridge Drive dwelling.

Apparently, the Pine Ridge Drive residence belonged to a former boyfriend of Mother's, Washington Hight. As best the Court could determine from the testimony of Ms. Johnson, Mr. Hight is 52 years old and he is presently incarcerated for leav-

ing the scene of an accident. Mother's testimony concerning her residence was extremely confusing. In one instance, Mother seemed to say she was moving to Pine Ridge Drive because she and her boyfriend were being evicted from the Belltown property. And yet, Mother also testified at this same hearing that she was packing all of her items at the Pine Ridge Drive property to move to the Belltown home. Mother also told the Court that she did not want the baby taken to the Belltown property because of her fear of her boyfriend's large dog. It is now clear to the Court that Mother did not have a stable residence for this child as of the date of the earlier hearing on May 23, 2005 when the Court allowed Mother to take the child home.

Testimony at the hearing on September 26, 2005 also produced additional important information. For one thing, the Court learned that Mother, on May 24, 2005, had entrusted the safety of her child to a friend, who the Court has difficulty identifying as either Penelope Horton or Ginny Logan, the child's godmother. This individual, whatever her name, was wearing an electronically monitored ankle bracelet. The Court is perplexed as to why Mother was willing to leave her child with an individual who she had not questioned as to why that person was wearing an ankle bracelet and on house arrest.

The Court also heard testimony which revealed Mother's inability to control her emotions. Officer Atkins testified how Mother, very calmly, rode up an elevator with her to visit the office of a DFS worker. However, upon riding down the elevator and being informed by the probation officer that she would have to return later to visit the DFS worker who was unavailable, Mother exploded into a fit of cursing the Division, swinging her arms about, and backing herself into a wall, thereby intimidating the probation officer.[6]

In light of all of the above, and if only the fact that Mother used crack cocaine the day before a hearing—a hearing the focus of which decided whether her child would be returned to her—the Court hereby modifies its decision of May 23, 2005 by finding by a preponderance of the evidence that, as of the date of the original taking on November 18, 2004 and continuing as of the date of the hearing on May 23, 2005, the child was dependent and neglected in Mother's care. As such, the date of the taking of this child is deemed to be November 18, 2004, and that date was only interrupted by a decision of this Court given in error based upon Mother's fraudulent testimony. Consequently, as of May 23, 2005, it continued to be in the child's best interest to remain in the custody and care of the Division of Family Services and it was contrary to the general welfare and safety of the child to be returned to Mother or Father. The parents' inability to provide appropriate and adequate care for this child continues as of the date of the September 26, 2005 hearing.

## DIVISION REQUIREMENTS FOR REUNIFICATION ASSISTANCE TO MOTHER

■ Having determined by a preponderance of the evidence at two separate hearings, with the first hearing being controlling, that the child is dependent and neglected and that the best interests of the child dictate that the child remain in the care of the Division of Family Services, the

6. Although at the hearing the Court permitted Nicholas Feil to testify by telephone about entries contained in Mother's prison file, in retrospect, the Court has chosen to strike the testimony since the file was not present for Mother's counsel's review and limited Mother's counsel's ability to appropriately and freely cross examine Mr. Feil.

question now becomes whether Mother is entitled to the assistance of the Division of Family Services in seeking reunification with her child. The Court already noted in its Order of July 11, 2005 that in 2001 and 2002 Mother's parental rights were involuntarily terminated based upon her failure to plan for the care of her two other children. At the hearing on March 21, 2005, the Division moved for a finding that the Division not be required to provide reunification services to Mother. Mother opposed the request and asked that the Division be ordered to provide her with a case plan and reunification services.

The Division asserts that once it has been established for the Court that the prior involuntary terminations occurred, the Division becomes the sole arbiter of whether or not they choose to offer reunification services to Mother. The Division argues both Federal and Delaware law support their legal position.

Federal law 42 U.S.C Section 671(a)15(D)(iii) states:

*"In Order for a State to be eligible for payments under [The Adoptions and Safe Families Act], it shall have a plan approved by the Secretary which . . . 15. provides that . . . (D) reasonable efforts of the type described in subparagraph (B) shall not be required to be made with respect to a parent of a child if a court of competent jurisdiction has determined that . . . (iii) the parental rights of the parent to a sibling have been terminated involuntarily."*

Federal regulations enacted since the passage of the Adoptions and Safe Families Act (ASFA) have further clarified this pro-

vision of the Federal law. 45 C.F. 1356.21(b)(3)(iii) states:

*"Circumstances in which reasonable efforts to prevent a child's removal from home or to reunify the child and family are not required if the State agency obtains a judicial determination that such efforts are not required because: . . . (iii)The Parental rights of the parents with respect to a sibling have been terminated involuntarily."*

Title 13, section 1103(d) of the Delaware Code states:

"The Department is not required to perform, but is not prohibited from performing, reunification and related services outlined in Chapter 90 of Title 29 when the grounds for termination of parent rights are those stated in subsections (a)(2), (4) or (6) of this section."

Subsection (2) is that the child has been abandoned. Subsection (4) is that the parent has committed a felony level offense where the victim was a child. Subsection (6) involves a parent whose parental rights have previously been involuntarily terminated. It is this final section (6), prior involuntary termination, that applies to the instant case.

It would appear that the clear wording of both the Federal and Delaware statutes mandates that once the Court has acknowledged a parental abandonment, a felony conviction where a child is a victim, or a prior involuntary termination of their parental rights, the Division seems the sole arbiter of whether or not to offer a parent reunification services. Indeed, in 2002, one of my colleagues issued an opinion agreeing with the position advanced by the Division.[7] In the *A.M.P.* case, the

---

7. *In re A.M.P.*, 2002 WL 31445226 (Del.Fam. Ct. Millman, J. 7/1/02), holding that the Division is to be the sole arbiter regarding whether reunification services are to be provided to a parent after the Court has determined the

parent has committed one of the aggravating acts proscribed under Del.Code Ann., tit. 13, § 1103(a)(4). The aggravating circumstances Mother committed in the *A.M.P.* case was that

Judge held that any action by the Court compelling the Division to offer reunification services under the foregoing statutorily prescribed aggravating circumstances would constitute a violation of the separation of powers doctrine upon which the legislature has spoken so clearly. However, this Judge has concerns that the precedent set forth in the *A.M.P.* case, which makes the Division the sole arbiter of whether to offer reunification services to a parent whose parental rights have previously been involuntarily terminated, might deny a parent their parental rights when that parent has instituted major positive changes in their life between the first involuntary termination of the child and subsequent court proceedings involving another child. Although the Court would certainly hope that the Division would follow their statutory grant of ability to offer reunification services to a reformed parent, the ruling in *A.M.P.* easily lends itself to circumstances where the Division could make an arbitrary decision against a parent who has dramatically changed his or her lifestyle and who thereafter merits reunification services. Thus, while respecting the opinion of my colleague in the *A.M.P.* case, the Court wonders if it could also be argued that both the Federal and State legislatures, in the writing of their respective statutes, have violated the doctrine of separation of powers by divesting the Court of its discretion in the long-recognized judicial role of making findings of fact which are in the best interests of a child.

In describing the doctrine of separation of powers, the Delaware Supreme Court has stated, *"This doctrine broadly stated is that a function inherently legislative may not be delegated to the executive or to the judiciary; and similarly, functions executive or judicial in nature may not be delegated to one of the other branches of government."* [8] Our Delaware Supreme Court has also stated that, " ... *the doctrine of separation of powers ... in Delaware ... does not obtain in full force as it does in some of the states."* [9] Thus, where there has been a history tacitly accepted by the separate bodies of government where one entity has traditionally carried out the authority which would generally be carried out by the other entity, Delaware has allowed a "practical construction" or exception to the doctrine of the separation of powers.[10]

Our Delaware Supreme Court has also set forth the basic principles of statutory construction when it stated the following:

[*128] ... If the words of a statute are clear and unambiguous and if their meaning is consistent with the underlying intent of the statute, there is no room for construction. In such a case it is the duty of a court ... to accept the language of the statute as embodying the legislative will. (Citations omitted). On the other hand, the literal meaning of a statute is not to be followed ... when it departs from the true intent and purpose of the statute and to conclusions inconsistent with the general purpose of the act. (Citation omitted) ... [11]

Thus, the Court questions whether the Legislature, in the writing of the statute, violated the doctrine of separation of powers by divesting the Court of the ability to

---

she was convicted of the manslaughter of a sibling of the child.

8. *Brennan v. Black,* 104 A.2d 777 (Del.1954).

9. *Brennan v. Black,* 104 A.2d 777 (Del.1954).

10. *Brennan v. Black,* 104 A.2d 777 (Del.1954) and *Opinion of the Justices,* 380 A.2d 109 (Del.1977).

11. *Opinions of the Justices,* 88 A.2d 128 (Del. 1952).

make determinations affecting the best interests of a child. This Judge is concerned that the legislature has taken from the Court an area of judgment inherently within the traditional province of the Court. Furthermore, the question concerning the best interests of a child has historically been within the jurisdiction of the Family Court, except, perhaps, in those child welfare cases which were being lost in the welfare system before the adoption of the ASFA. One of the driving motivations of the ASFA was to again get the Courts involved in the area of child welfare. The ASFA empowered the Courts to oversee the efforts of child protective divisions across the country. The prior arbitrary control of these divisions had led parents to distrust the services offered by the divisions. These feelings of distrust partially led to the divisions' inability to assist parents in reunification with their children. Without the Court's oversight and involvement, the child protective divisions failed to provide permanency to children who would languish in foster care over many years and who were shuffled from home to home while in placement.

If this case involved circumstances in which a parent whose parental rights had previously been involuntarily terminated, but who had now improved considerably her parenting skills and ability to provide adequate and loving care to her child, this Judge might well have had to respectfully disagree with the learned opinion of his fellow colleague. However, the mother in this particular action is not such a parent who has demonstrated such a dramatic improvement in her life. As such, the Court, at this time, is content to recognize the finding of its colleague in the *A.M.P.* case, but noting the separation of powers caveat expressed herein for possible future matters. As such, the Court will defer the decision of whether or not to offer reunification services to Mother to the Division of Family Services.

Within ten days of the date of the mailing of this Order, the Division shall notify the Court and the parties of its determination as to whether or not they intend to offer reunification services to Mother. Thereafter, the Court will schedule such hearing as is appropriate to both parties based upon the Division's election.

IT IS SO ORDERED.