**OPINION OF THE JUSTICES.**

Supreme Court of Delaware.

Nov. 1, 1977.

To His Excellency
Pierre S. duPont, IV
Governor of Delaware:

Reference is made to your letter, dated May 11, 1977, requesting the opinion of the Justices of the Supreme Court of Delaware, under 10 *Del.C.* § 141,[1] upon the following questions:

"1. Does the transfer *in toto* of the functions of the Division of Maintenance and Communications of the Department of Administrative Services, together with its personnel, records and equipment, from the Executive Department to an administrative agency of the General Assembly as mandated by Chapter 4, Volume 61, Laws of Delaware, violate Article III, Section 1 of the Delaware Constitution of 1897?[2]

2. Does the delegation of authority to ten members of the General Assembly to invest such additional powers and functions as they should elect upon an administrative agency constitute a delegation of the legislative power of the General Assembly in violation of Article II, Section 1 of the Delaware Constitution of 1897?"[3]

In considering the request, we have had the valuable assistance of Regina Small, Esquire, Deputy Attorney General, who filed a brief in support of the constitutionality of 61 *Del.L.* Ch. 4. We have also had the valuable assistance of Irving Morris, Esquire, Joseph Rosenthal, Esquire, and Ira Conrad, Esquire, who briefed the proposition that the Act violates the Delaware Constitution.

I.

On January 13, 1977, the General Assembly enacted 61 *Del.L.* Ch. 4,[4] (hereinafter

---

1. 10 *Del.C.* § 141 provides in part:

"The Justices of the Supreme Court, whenever the Governor of this State may require it for public information, or to enable him to discharge the duties of his office with fidelity, may give him their opinions in writing touching the proper construction of any provision in the Constitution of this State, or of the United States, or the constitutionality of any law enacted by the General Assembly of this State or the constitutionality of any proposed constitutional amendment which shall have been first agreed to by two thirds of all members elected to each house."

2. *Del.Const.* Art. III, Sec. 1 provides:

The supreme executive powers of the State shall be vested in a Governor.

3. *Del.Const.* Art. II, Sec. 1 provides:

The Legislative power of this State shall be vested in a General Assembly, which shall consist of a Senate and House of Representatives.

4. 61 *Del.L.* Ch. 4 amended 29 *Del.C.* Ch. 11 as follows:

"§ 1131. Division of Maintenance, Communications and Capital Security.

"There is established the Division of Maintenance, Communications and Capital Security,

"the Act") which transferred the powers, duties, and functions, and the personnel, funds, records and equipment of the Division of Maintenance and Communications of the Department of Administrative Services, a part of the Executive Branch of State government, to a new Division of Maintenance, Communications and Capital Security under the supervision and control of the Legislative Council, an agency of the General Assembly. The Act was approved by Governor Sherman W. Tribbitt on January 15, 1977.

An understanding of the evolution of the prior Division of Maintenance and Communication of the Department of Administrative Services is important to the solution of the problem presented regarding the validity of the Act, here in question, creating the successor Division of Maintenance, Communication, and Capital Security of the Legislative Council.[5]

which Division shall be under the direction and supervision of the Legislative Council."

"§ 1132. Director: Personnel: Merit System.

"(a) The Division of Maintenance, Communications and Capital Security shall be administered by a director who shall be selected by the Legislative Council by majority vote.

"(b) All employees of the Division of Maintenance and Communications, heretofore established by Executive Order No. 7 approved April 6, 1973, including the Director, shall be transferred to the Division of Maintenance, Communications and Capital Security and shall be deemed to be employees of such Division and employees of the State in classified service with all the benefits accrued as merit employees as of the effective date of this subchapter."

"§ 1133. Powers, Duties and Functions.

"(a) The Division of Maintenance, Communications and Capital Security shall have all the powers, duties and functions heretofore vested in the Division of Maintenance and Communications established by Executive Order No. 7 approved April 6, 1973, and such other powers, duties and functions as may be assigned to it by law or by Legislative Council by majority vote.

"(b) All personnel, funds, property, books, records, papers, plans and other materials including, but not limited to, any equipment in possession of any agency of the State and used in connection with the function hereby transferred to the Legislative Council shall on the effective date of this Act be delivered unto the custody of the Legislative Council. The service and employee positions to be transferred to the Legislative Council as contemplated by this section must be approved by the Controller General and the Budget Director."

5. The Legislative Council was created by 29 *Del.C.* Ch. 11 which provides in part:

"§ 1101. Creation of Legislative Council; composition.

"(a) There is created a Legislative Council which shall be composed of 10 members of the General Assembly as follows:

"(1) From the Senate: the President Pro Tem, the Majority Leader, the Minority Leader, 1 member appointed by the President Pro Tem and 1 member appointed by the Minority Leader.

"(2) From the House: the Speaker of the House, the Majority Leader, the Minority Leader, 1 member appointed by the Speaker and 1 member appointed by the Minority Leader.

"(b) The Governor or his designated alternate and the Executive Director of the Legislative Reference Bureau shall be ex officio members of the Council without vote."

"§ 1104. Duties of the Council.

"The Council shall:

"(1) Summarize and digest information of matters relating to the general welfare of the State;

"(2) On its own initiative or at the direction of the General Assembly or of the Senate or House, make studies on subjects of interest and concern and, based thereon, recommend such legislation as the welfare of the State may require;

"(3) Recommend such codification and general revision of the Constitution and the laws of the State as may from time to time be necessary;

"(4) Recommend such changes in the rules and procedures of the Senate and House as may advance the consideration of legislation by the General Assembly;

"(5) Cooperate with and assist the work of interim committees or of commissions appointed at the direction of the General Assembly or of the Senate or House;

"(6) Cooperate with the appropriate committees of the General Assembly or of the Senate or House to assure efficient utilization of its employees;

"(7) Arrange for the obtaining of the printing needs and supplies and equipment of the General Assembly, subject to the laws of the State relating to the purchasing of state supplies;

"(8) Employ such staff as it deems necessary to carry out the provisions of this chapter."

"§ 1105. Powers of the Council.

"The Council shall:

"(1) Receive recommendations and suggestions for studies or legislation from all sources;

"(2) Appoint committees and subcommittees which shall include only members of the General Assembly, and

The Division of Maintenance and Communications was established in April 1973, as part of the Department of Administrative Services, by Executive Order No. 7[6] issued by Governor Tribbitt pursuant to the authority granted to the Secretary of the Department under 29 *Del.C.* § 8803(4)[7] to create, rearrange, or combine divisions within the Department, with the approval of the Governor.

Executive Order No. 7 superseded 29 *Del.C.* § 8805[8] which established the Divi-

"(3) Adopt such rules and procedures as may be necessary or appropriate to carry out its duties;

"(4) Request information from any officer or agency of the State or of its political subdivisions bearing on subjects under consideration by the Council or by any of its committees or subcommittees."

Under § 1106 the Council is empowered to appoint a Director of Research whose duties under § 1107(a) are as follows:

"§ 1107. Duties of the Director of Research.

"(a) The Director of Research shall:

"(1) Organize and supervise the research division of the Council;

"(2) Submit and publish such reports as the Council directs;

"(3) Employ or engage assistants, stenographers and other persons or research agencies, subject to the approval of the Council;

"(4) Assist any member of the General Assembly with respect to present or prospective legislation within the limits of his staff and budget."

Under § 1110, the Council is empowered to appoint a Controller General whose duties are as follows:

"§ 1110. Controller General; responsibility; duties; compensation.

"(a) The Council shall appoint a Controller General who, primarily shall work with and assist the Joint Finance Committee of the General Assembly.

"(b) The Controller General shall:

"(1) At all times have full and complete access to all records of all agencies of the state government;

"(2) Participate in any or all hearings held by the Joint Finance Committee of the General Assembly, the Budget Director, or other State agencies in connection with contemplated General Fund Budget appropriations, Capital Improvement Programs or Supplementary Appropriations;

"(3) Request and obtain from any state agency all reasonable information and data, as directed by the Joint Finance Committee, to assist the General Assembly in the effective discharge of its State financial responsibilities; and

"(4) Perform such duties as may be assigned or delegated to him by the Legislative Council."

**6.** Paragraph 4 of Executive Order Number 7 provided:

"The creation of the Division of Maintenance and Communications is hereby confirmed. The Division shall have the power to perform and shall be responsible for the performance of all the powers, duties and functions heretofore vested in the Division of State Buildings pursuant to the provisions of Chapter [88] of Title 29 of the Delaware Code Annotated. Shall further have the powers and duties to supervise and account for the administration and operation of Communication, Messenger and Mail services heretofore administered by the Division of State Buildings pursuant to § 8804(a)(1) [now subsection (a)(1) of this section] of Chapter 88 of Title 29 of the Delaware Code Annotated, as well as those powers, duties and functions as may be assigned to it by law or by the Secretary of the Department of Administrative Services."

**7.** "§ 8803. Powers, duties and functions of the Secretary.

"The Secretary shall have the following powers, duties and functions:

\* \* \* \* \* \*

"(4) To establish, consolidate or abolish such divisions, subdivisions and offices within the Department or transfer or combine the powers, duties and functions of the divisions and offices within the Department as the Secretary, with the written approval of the Governor, may deem necessary, provided that all powers, duties and functions required by law shall be provided for and maintained;

\* \* \* \* "

**8.** "§ 8805. Division of State Buildings.

"(a) The Division of State Buildings is established having powers, duties and functions as follows:

"(1) The Division of State Buildings shall supervise and account for the administration and operation of the communication services provided by the state telephone system, the messenger service and the mail department, heretofore administered by the Secretary of State.

"(2) The Division of State Buildings shall have the power to perform and shall be responsible for the performance of all the powers, duties and functions heretofore vested in:

"a. The State Building and Grounds Commission pursuant to Chapter 4 of this title;

"b. The Custodian of the State House pursuant to Chapter 4 of this title.

"(3) The administrative, ministerial, fiscal and clerical functions of the Wilmington Civic Center State Office Building Commission, as established by law, shall be performed by the Division of State Buildings.

sion of State Buildings and vested in it the powers and duties of the prior State Building and Grounds Commission and the Custodian of the State House, all being agencies of the Executive Branch.

Going behind 29 *Del.C.* § 8805: the powers and duties of the State Building and Grounds Commission included approval of the architecture and landscaping of all new State buildings and advice upon the furnishing of public rooms and halls. 29 *Del.C.* § 3105; 48 *Del.L.* Ch. 116, § 1; 44 *Del.L.* Ch. 211, §§ 5, 7. It was the duty of the Custodian of the State House to take charge of, and care for, the State House and other State administrative buildings. 36 *Del.L.* Ch. 3, §§ 2, 3. The latter Statute superseded several Statutes, dating from 1891, which placed responsibility for the maintenance, custodial care, and general supervision of the State House within the Executive Branch of the State Government. 19 *Del.L.* Ch. 64; 21 *Del.L.* Ch. 8; 24 *Del.L.* Ch. 82; 26 *Del.L.* Ch. 7. All of these agencies and functions were unquestionably within the Executive Branch. Similarly, as to communications, the State Department, a cabinet level department of the Executive Branch, provided telephone, messenger, and mail service to State agencies for decades prior to the vesting of that responsibility in the Department of Administrative Services by Executive Order No. 7. 35 *Del.L.* Ch. 39; 40 *Del.L.* Ch. 82.

It thus seems beyond question that all of the functions, powers, and duties, vested by the Act in the new Division of Maintenance, Communications, and Capital Security of the Legislative Council, had been historically vested in the Executive Department of the State government.

It is important, too, to understand the nature of the functions and duties of the Division which was transferred by the Act. To summarize and particularize with undisputed factual data provided under the affidavit of the Secretary of the Department of Administrative Services without objection:

The Division, just as when transferred from the Department to Legislative Council by the Act, provides services in 3 major areas: custodial—maintenance, security, and communications. The Division has a large staff of custodial workers who keep clean and in good order the State buildings in the Capitol complex and other State buildings located throughout the State. To insure the proper maintenance of these buildings, the Division has a number of shops to perform the following services as needed: painting, carpentry, electric, plumbing-heating-air conditioning and mechanical. In addition, maintenance workers are stationed at the following buildings: the Highway Building, Wilmington Motor Vehicle Inspection Lane, Georgetown Motor Vehicle Inspection Lane, New Castle County Motor Vehicle Inspection Lane, Thomas Collins Annex, Townsend Building and Legislative Hall. Division employees keep the grounds around the State buildings properly landscaped and free of refuse. Landscaping and custodial workers are also permanently assigned to Buena Vista and the Governor's House.

Security for State buildings in the Capitol area is provided by a police force consisting of approximately fifteen policemen. They patrol the buildings and grounds of the Capitol complex and provide a night watchman for Legislative Hall.

Other Division employees take care of delivering messages, packages, payrolls and interoffice mail between and among the various state agencies located throughout the State. The Division also mans and operates a state telephone service system which connects state offices in the Capitol area with one another.

At the time of its transfer to legislative jurisdiction, the Division was, with 126 full-time employees, the largest division within the Department.

In addition to performing the various functions outlined above, the Division also

"(b) Except as otherwise provided in subsection (a)(3) of this section the membership, remuneration, organization, meetings, powers,

duties and functions of the Wilmington Civic Center State Office Building Commission shall remain as prescribed by law."

has responsibility for the following fiscal functions: preparation of monthly energy conservation reports, maintenance of petty cash funds for both the Governor's House and the Director of the Division's office, recording of disbursements by the Division, writing purchase orders, providing raw data for processing the Division's payroll, and preparation of a monthly vacancy report.

\* \* \* \* \* \*

It is manifest that the foregoing functions are inherently executive and have been considered so by the General Assembly for decades. The supreme executive power, vested in the Governor by *Del.Const.* Art. III, § 1, is the power to carry out and administer the laws. The supreme legislative power, vested in the Houses of the General Assembly under *Del.Const.* Art. II, § 1, is the power to make the laws. The facts compel the conclusion that, by the Act, the General Assembly vested in the Legislative Council, an agency of the General Assembly, powers and functions pertaining to the administration of the laws and not the making thereof. By so doing, the General Assembly took unto itself powers and functions inherently executive.

That determination having been reached, the constitutional question then becomes this: Is the assumption by the Legislative Branch of inherent Executive Branch powers a violation of the Separation of Powers Doctrine of such dimension as to invalidate the Act?

### II.

The Doctrine of Separation of Powers is a rule forbidding one branch of government from exercising powers exclusively assigned to another, and forbidding one branch of government from allowing its powers to be exercised by another branch. Otherwise broadly stated, under the Doctrine, "a function inherently legislative may not be delegated to the executive or to the judiciary; and similarly, functions executive or judicial in nature may not be delegated to one of the other branches of government." *Brennan v. Black,* Del.Supr., 34 Del.Ch. 380, 104 A.2d 777, 781 (1954); *In re Opinions of the Justices,* 8 Terry 117, 88 A.2d 128 (1952); *Trustees of New Castle Common v. Gordy,* Del.Supr., 33 Del.Ch. 334, 93 A.2d 509 (1952).

Like the Constitution of the United States, the Constitution of Delaware contains no express provision requiring the separation of powers; but, unquestionably, it exists in this State as a fundamental in our constitutional law. *In re Opinions of Justices, supra,* 88 A.2d at 138. "It admits of no doubt that from the beginning our state government has been divided into the three departments, legislative, executive and judicial. \* \* \* It is likewise true that, generally speaking, one department may not encroach on the field of either of the others." *Trustees of New Castle Common v. Gordy, supra,* 93 A.2d at 517.

The Doctrine, dividing government among the three separate branches, is deemed a basic concept in the theory, history, and development of constitutional government for two main purposes: first, to protect the liberty of the citizen; and second, to safeguard the independence of each branch of the government and protect it from domination and interference by the others. Antieau, *Modern Constitutional Law,* § 11.13. Frequently, over the years, the U.S. Supreme Court has recognized the continuing validity of the Doctrine. In the *Sinking Fund Cases,* 99 U.S. 700, 25 L.Ed. 496 (1879) the Court said: "One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule." On another occasion: "By [the doctrine] democracy undertakes to preserve the liberties of the people from excessive concentration of authority," *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). And again: "The fundamental necessity of maintaining each of the three general departments, entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question. So much is implied in the very fact of the separation of the pow-

ers of these departments by the Constitution; and in the rule which recognizes their essential co-equality." *Humphreys Executor v. United States,* 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935).

In Delaware, as under the federal concept and in accord with the approach in many other states, the Doctrine does not "obtain in full force", *Brennan v. Black, supra,* 104 A.2d at 781, and has not been applied with "theoretical rigor", *In re Opinions of the Justices, supra,* 88 A.2d at 138. This is recognition of the propositions that a strict adherence and complete separation of governmental departments is neither desirable nor intended; that a certain degree of pragmatic flexibility in the application of the Doctrine is essential to the maximum success of our constitutional system, allowing for newly perceived needs and practical exigencies. *Nixon v. Administrator of General Services,* D.C., C.A., 408 F.Supp. 321 (1976). See *The Federalist* No. 47; *Ex parte Grossman,* 267 U.S. 87, 45 S.Ct. 332, 69 L.Ed. 527 (1925); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *Laisne v. California State Board of Optometry,* Cal.Supr., 19 Cal.2d 831, 123 P.2d 457 (1942); *Trybulski v. Bellows Falls Hydro-Electric Corp.,* Vt.Supr., 112 Vt. 1, 20 A.2d 117 (1941); *Bailey v. State Board of Public Affairs,* Okl.Supr., 194 Okl. 495, 153 P.2d 235 (1945); *State ex rel. Schneider v. Bennett,* Kan.Supr., 219 Kan. 285, 547 P.2d 786 (1976).

It is upon the latter aspect of the Doctrine that the proponents of the Act place principal reliance.

### III.

■ The proponents concede that the Doctrine of Separation of Powers prevails generally in this State, and that the duties and functions of the Division transferred under the Act by the Legislature to one of its own agencies are "executive in nature." But they contend that in the absence of strict adherence to the Doctrine of Separation in this State, the Act should be found constitutional. In support of this position, the proponents point to no authority except *State ex rel. Craven v. Schorr,* Del.Supr., 11 Terry 365, 131 A.2d 158 (1957) and *Opinions of the Justices,* Del.Supr., 88 A.2d 128 (1952). Those decisions are wholly inapposite.

In *Schorr,* the power of the General Assembly to reserve unto itself appointment of members of the State Highway Department was challenged as a usurpation by the legislative branch of the executive power of appointment. The Court concluded that, under *Del.Const.,* Art. III, § 9,[9] the Governor "has no vested constitutional power to appoint statutory offices"; that "[I]n this respect our constitutional law differs from that of many other states"; and that this is "[o]ne striking departure from the separation principle." There is no such extraordinary constitutional feature in the present situation.

Similarly, the situation in the *Opinions of the Justices,* relied upon by the proponents, is clearly distinguishable. There, the question was whether the Statute providing for the furnishing of advisory opinions of the Justices of the Delaware Supreme Court upon the request of the Governor violated the separation of powers doctrine. The Opinion traced a long chain of legislative enactments in this State, over a long period of time, whereby non-judicial powers and duties were "conferred" upon members of the judiciary and whereby "from early times the judges of the courts have been required to perform executive and administrative duties of the most varied nature." It was concluded that such chain of legislative enactments afforded "a practical construction by the people of the State through their representatives of the doctrine of separation of powers" (88 A.2d at 139). Otherwise stated, it was found that by such "practical construction," the people had authorized an exception to the Doctrine.

---

9. *Del.Const.,* Art. III, § 9 defines the Governor's powers in respect of appointment as follows:

"He shall have power, unless herein otherwise provided, to appoint, by and with the consent of a majority of all the members elected to the Senate, such officers as he is or may be authorized by this Constitution or by law to appoint."

No such chain of legislative enactments may be pointed to in the instant situation to demonstrate a "practical construction" of, or exception to, the Doctrine,[10] supportive of the Act. Indeed, on the contrary, the long legislative chain of enactments pertaining to the duties and functions of Division here involved bespeak not justification but usurpation of powers historically considered inherently executive in nature by the representatives of the people.

Much more to the point than the inapposite authorities upon which the proponents rely is *State of Kansas, etc. v. Bennett, Governor, etc.,* Kan.Supr., 219 Kan. 285, 547 P.2d 786 (1976). There, as here, the question was the constitutionality under the Doctrine of Separation of Powers of a statute vesting in a state finance council (consisting of the governor and 8 members constituting the leadership of the Legislature) supervision and control over the State Department of Administration, formerly a part of the executive branch of the State government. There, as in this State, strict application of the Doctrine was rejected.[11] There, as here in our view, the question came down to whether there was an usurpation by one branch of the government of the powers and functions of another branch.

In determining whether an unconstitutional usurpation occurred, the Kansas Supreme Court stated the factors to be considered as follows:

"First is the essential nature of the power being exercised. Is the power exclusively executive or legislative or is it a blend of the two? A second factor is the degree of control by the legislative department in the exercise of the power. Is there a coercive influence or a mere cooperative venture? A third consideration of importance is the nature of the objective sought to be attained by the legislature. Is the intent of the legislature to cooperate with the executive by furnishing some special expertise of one or more of its members or is the objective of the legislature obviously one of establishing its superiority over the executive department in an area essentially executive in nature?" (547 P.2d at 792.)

Under those tests, the Court held that the statutory powers and duties granted to the state finance council to supervise the day to day operations of the department of administration were "purely an exercise of executive power"; that the vesting of such powers in the state finance council clearly granted "to a legislatively oriented body control over the operation of an executive agency and constitutes a usurpation of executive power by the legislative department"; that, by so doing, the Legislature unconstitutionally "violated the doctrine of separation of powers." (547 P.2d at 797–8.)

We find the reasoning and conclusion of the Kansas Supreme Court in this extraor-

---

**10.** A similar inapposite example of the "practical construction" of the Doctrine urged by the proponents of the Act is *Brennan v. Black,* supra, involving a challenge of the delegation of legislative taxing power to school districts; there, similarly, a chain of legislative enactments, reinforced by judicial approval, was found to constitute a "practical construction" amounting to an historical exception to the Doctrine. (104 A.2d at 782). And, again, in *Trustees of New Castle Common v. Gordy,* supra, an historical legislative review led to the conclusion that "from early times charitable trusts have been regarded in this state as a proper subject for legislative acts designed to protect and further the objects of the trust." (93 A.2d at 517). No such legislative history supports the Act here in question.

**11.** "In our judgment a strict application of the separation of powers doctrine is inappropriate today in a complex state government where administrative agencies exercise many types of power including legislative, executive, and judicial powers often blended together in the same administrative agency. The courts today have come to recognize that the political philosophers who developed the theory of separation of powers did not have any concept of the complexities of government as it exists today. Under our system of government the absolute independence of the departments and the complete separation of powers is impracticable. We must maintain in our political system sufficient flexibility to experiment and to seek new methods of improving governmental efficiency. At the same time we must not lose sight of the ever-existing danger of unchecked power and the concentration of power in the hands of a single person or group which the separation of powers doctrine was designed to prevent." 547 P.2d at 791.

dinarily analogous case to be most persuasive. Tested by its criteria, it is clear that the Act is an unconstitutional usurpation of executive powers by the General Assembly: (1) Concededly, the powers and functions transferred by the Act are inherently executive in nature; (2) the degree of control transferred from the Executive Branch to the arm of the Legislature is total; control is by majority vote of the legislative members of the Legislative Council, with no vote for the Governor or his designee; and (3) the nature and purpose of the Legislative Council, solely a research and service arm of the General Assembly under the Statute which created it (29 *Del.C.* §§ 1104, 1105), is manifestly foreign to the administrative duties sought to be imposed upon it by the Act; clearly, there was no intent on the part of the General Assembly to cooperate with the Executive Branch by furnishing any special expertise of the Legislative Council; and, obviously, the objective of the Legislature was simply "one of establishing its superiority over the executive department in an area essentially executive in nature."

\*　　\*　　\*　　\*　　\*　　\*

The proponents of the Act contend, however, that even if the Doctrine of Separation of Powers is applicable generally in this situation, the functions of the new Division are ancillary to the legislative function and the Act is severable insofar as Legislative Hall, the home of the General Assembly, is involved; that, therefore, the Act should not be invalidated under the Doctrine, at least in its application to Legislative Hall.

■ The Act is so drawn as to be indivisible upon this ground; there is no separate provision relating to Legislative Hall which may be found severable. While the General Assembly unquestionably has inherent authority over its own housing and the security of its members therein, it is impossible to extract control and supervision of Legislative Hall, or any part thereof, from the general provisions of the Act without rewriting it.

## IV.

Upon the basis of the foregoing, we are of the opinion (1) that there is no legislative background underlying the Act sufficient to create an exception to the Doctrine of Separation of Powers; and (2) that, by the Act, there has been an impermissible encroachment by the General Assembly upon the Executive Branch of the State Government in violation of the Doctrine.

In our opinions, therefore, 61 *Del.L.* Ch. 4 is unconstitutional and invalid under Article III, Section 1 of the Delaware Constitution.

Accordingly, our response to your Question No. 1 is affirmative.

\*　　\*　　\*　　\*　　\*　　\*

In view of this conclusion, we do not reach your Question No. 2.

\*　　\*　　\*　　\*　　\*　　\*

The foregoing constitutes the unanimous opinion of the undersigned.

Respectfully,

DANIEL L. HERRMANN
　Chief Justice
WILLIAM DUFFY
JOHN J. McNEILLY
　Justices