In re the Matter of DIVISION OF FAMILY SERVICES, Petitioners,

v.

Rachel JAMES

and

Orson Beck, Respondents.

In the Interest of Angela R. Beck DOB: [REDACTED].

File No. CS09–02602.
Petition No. 09–25712.

Family Court of Delaware, Sussex County.

Submitted: Nov. 3, 2009.
Decided: Dec. 18, 2009.

Kathryn Welch, Esquire, Delaware Department of Justice, Georgetown, DE, Attorney for the Division of Family Services.

Ashley Oland, Esquire, Law Office of Edward C. Gill, P.A., Georgetown, DE, Attorney for Rachel James.

Patricia O'Neil, Esquire, Law Office of Patricia M. O'Neil, Esquire, Georgetown, DE, Attorney for Orson Beck.

## OPINION

HENRIKSEN, J.

In this child dependency case the Division of Family Services of the State of Delaware (DFS) has filed a motion in

which DFS is requesting the Court to determine DFS is not required to make reasonable efforts to promote the reunification of the parents with their 3 month old child, and to also change the goal of the case from reunification to termination of parental rights. DFS submits it is not required under either the 1997 Federal Adoption and Safe Families Act (ASFA)[1] or Delaware law[2] to provide reunification services to Mother and Father, because their parental rights in a sibling of this child were previously involuntarily terminated by the Family Court of the State of Delaware. DFS avers, given the circumstances of this case, the decision to offer or deny this mother reunification efforts is a decision to be made by the Division, and not by the Court. The Court disagrees.

## FACTS

This now 3 month old child was taken into care on August 04, 2009, by Emergency Order when there were concerns the child was born drug positive, and Father was incarcerated. In fact, at a Preliminary Protective Hearing held August 10, 2009, Mother waived both her Preliminary Protective[3] and Adjudicatory Hearings[4] based upon her substance abuse. Father waived both his Preliminary Protective and Adjudicatory Hearings based upon his present incarceration. Father expects to be incarcerated for at least the next five months at the State prison in Smyrna, Delaware. Father has several serious felony charges pending against him for incidences which allegedly occurred on May 19, 2009. He also will soon be coming up for trial on the charge of Rape in the 4th Degree for allegedly having sexual intercourse with a victim who was less than 16 years of age on February 14, 2004. Father also has an extensive prior criminal conviction history involving such crimes as Criminal Trespass, Assault in the 3rd Degree, and Criminal Contempt of a Family Court Protective Order, just to name a few of his prior convictions.

Mother and Father had another child between them, Aaliyah, born [redacted].[5] Aaliyah was conceived when Father was 18 years old, and Mother was 13 years old. It is for this act of conception Father will soon be going to trial on the above-noted charge of Rape in the 4th Degree. Moth-

---

1. 42 U.S.C. § 671 (2009).

2. Del.Code Ann. tit. 13, § 1103(d) (1999) (citing Del.Code Ann. tit. 13 § 1103(a)(6) (1999)).

3. Delaware Family Court Civil Procedure Rule 212(a) reads as follows: "If an ex parte order is granted, a preliminary protective hearing shall be scheduled before a judge within 10 days of the entry of the ex parte order; or if an ex parte order of custody is not entered but the Court finds that priority scheduling is warranted, a preliminary protective hearing shall be scheduled within 10 days of the filing of the petition. The Court shall determine whether the evidence demonstrates that probable cause exists to believe that a child continues to be in actual physical, mental or emotional danger or there is a substantial imminent risk thereof. The finding of probable cause may be based upon hearsay evidence in whole or in part."

4. Delaware Family Court Civil Procedure Rule 213(a) and (b) state the following: "(a) Unless a respondent waives his or her right to an adjudicatory hearing and agrees to continued custody of the child with the Department of Services for Children, Youth and their Families, an adjudicatory hearing shall be scheduled within 30 days of the entry of the preliminary protective order. (b) If the Court finds by a preponderance of the evidence that a child is dependent, neglected or abused and it is in the child's best interests, an order in accordance with title 10, Section 1009(b) of the *Delaware Code* shall be entered together with such other terms and conditions that may be set forth by the Court."

5. The names of the parties in this case have been changed pursuant to Supreme Court Rule 7(d).

er was in foster care during the time period Aaliyah was taken into DFS protective care on March 09, 2007. While Mother was in foster care, the parental rights of both Mother and Father in Aaliyah were terminated by Decision and Order dated July 27, 2009.[6] The termination of parental rights trial leading to the Decision of July 27, 2009, was held on July 01, 2009. A review of the Court's Decision which led to the termination of the parents' former rights in now 5 year old Aaliyah reflects Mother failed to fulfill her case plan, showed little progress, did not appear at several hearings, including the final termination of parental rights hearing, and pursued very little contact, if any, with Aaliyah. The Court found Aaliyah's father had considerable lack of contact with the Division and failed to complete his case plan, most likely because he was generally incarcerated on multiple criminal charges. The Court's Decision in the termination of Father's parental rights as to Aaliyah emphasized Father's criminal history at that point in time, noting the following:

> Father has a total of 123 arrests, 95 of which are criminal, 23 of which are felony arrests. He has one felony conviction. He has 88 misdemeanor arrests and four misdemeanor convictions. He is currently detained for pending charges of Rape 4th Degree; Possession of a Firearm During the Commission of a Felony; Possession, Purchase, Own, or Control of a Firearm By a Person Prohibited; Assault 2nd Degree; four counts of Reckless Endangering First Degree; Wearing a Disguise During the Commission of a Felony; and Criminal Mischief Under $1,000.[7]

In the present matter, the Court had intended to proceed on September 28, 2009, with the Dispositional Review Hearing, the purpose of which normally would be to review the case plan prepared by the Division. The case plan is the road map the parents need to follow and successfully complete in order to achieve a goal of reunification with the child.[8] However, prior to the September 28th hearing, on September 22, 2009 the Division filed their present motion to not allow reunification services. Because the Division's motion did not provide the minimum 30 days advance notice for the parents to respond, counsel for both parents objected to the matter going forward on the Division's motion on that date.[9] The parents' attorneys wanted to proceed with the Dispositional Review Hearing because the Division case worker had already tendered a case plan to Mother, and Mother had been actively pursuing the goals under the case plan. The Court determined that it would not be in the nature of judicial economy to proceed with the Dispositional Review Hearing on September 28th until deciding the Division's motion. However, because a case plan had been tendered, and Mother's attorney indicated Mother was operating under the case plan, the Court required the Division to continue to offer the reunification services provided in the case plan until the motion was decided after a hearing on the issue.

Testimony at the ensuing "No Reasonable Efforts/Permanency Hearing" began with Barbara Westfall, who chaired the Permanency Planning Committee (Committee) for the Division of Family Services. According to Ms. Westfall, using an early screening tool to evaluate the child shortly

---

**6.** *DFS v.* ——, Del.Fam., File No. 08–06–2TK, Walls, J. (July 27, 2009).

**7.** *Id.*

**8.** Del.Fam.Ct. Civ. R. 214 (1999).

**9.** Del.Fam.Ct. Civ. R. 216(e) (1999).

after the child's birth on August 06, 2009, the Committee determined several risk factors existed which identified this child for an early determination by the Permanency Committee as to whether they would ask the Court to find that no reasonable efforts at reunification were required. According to Ms. Westfall, those four factors included the prior involuntary termination of another sibling, Mother's prior history of substance abuse, Father's repeat criminal history, and Mother herself having been previously in foster care as a child.

The Permanency Planning Committee met on September 08, 2009. The child's case worker, Rhonda Bailey, participated by telephone. According to Ms. Westfall, Rhonda Bailey told the Committee she saw no positive changes in the parents from these identified risk factors. The Committee therefore urged the Division attorney to file with the Court a motion for no reasonable efforts.

Upon cross-examination by Mother's counsel, Ms. Westfall was unable to recall several specifics of the findings and discussion made at the Permanency Planning Committee meeting. These meetings apparently last no more than 20 minutes. Ms. Westfall did not know whether any of the people on the Committee had reviewed the prior records about Mother and Father. Ms. Westfall herself had not reviewed the prior records. Ms. Westfall was sure Mother had been the person identified as previously being in foster care. Ms. Westfall was not clear whether Mother or Father had previously been abused or neglected. Ms. Westfall was "pretty sure" only Father had been incarcerated. She could not clearly identify whether both Father and Mother had prior criminal records.

Upon further cross-examination, Ms. Westfall acknowledged the only risk factor

that either parent could really change was whether they were presently abusing illegal substances. Obviously, there was no way either parent could change the prior circumstances of previously having their parental rights involuntarily terminated in another sibling. Nor could they change the fact they had a prior criminal history, if that was accurate. Furthermore, neither parent could change their previous history of being in foster care and/or previously being abused or neglected.

According to Ms. Westfall, if she and the Committee had been informed Mother was now actively operating under a case plan, they might have changed their recommendation. Ms. Westfall recalled Mother at the time of the meeting had no employment. Ms. Westfall also recalled case worker Bailey telling the group Mother was supposed to be in substance abuse treatment, and Mother did not have stable housing. The Committee was not aware if Mother was enrolled in and attending a parenting class.

Ms. Westfall also indicated the Committee does not take into account the age of the parent. Thus, it appears that the Committee does not consider the potential differences between a 14–year–old mother having her parental rights involuntarily terminated while she herself was in foster care as opposed to the termination of the parental rights of a 25–year–old mother, or, even as in the present case, a mother who is now 19 years old.

Ms. Westfall testified she was not sure whether the risk factors used by the Committee are contained in any particular user or policy manual of the Division. Ms. Westfall also indicated a parent's intent is not an issue for the Committee; instead, the Committee simply looks at the risk factors.

One of the most interesting exchanges in the courtroom occurred when Ms. Westfall was asked by Mother's attorney what might have changed the Committee's determination that the Division should not offer reunification efforts. Ms. Westfall very clearly responded the Committee's purpose was simply to make known to the Court the existence of the various risk factors, and the Division was looking for the Court to decide whether reunification efforts should proceed or not. According to Ms. Westfall's understanding, the Division's goal continues to be reunification until the Court decides that a different permanency goal should be pursued. Ms. Westfall's understanding did not include an opinion the Permanency Committee's recommendation is binding upon the Court and must be accepted by the Court. This particular exchange between Ms. Westfall and Mother's attorney spoke clearly to the very issue before the Court. That issue is whether the Division or the Court has the final say in determining whether to offer reunification services to a parent whose parental rights have previously been involuntarily terminated in a sibling of the child now at issue.

The Court next heard the testimony of the child's foster mother. The child has been in Foster Mother's home since August 05, 2009. Foster Mother's testimony demonstrated this child has some special medical needs which require a parent who is attentive, observant, and vigilant on a 24 hour basis. At the same time, the child's medical needs do not require any type of expert training, such as how to use some special type of monitor or how to insert some special type of catheter. The child has been diagnosed with cardiomyopathy, which is a heart condition where, in this child, the left side of her heart has not fully developed. She may require a heart transplant at some time in the future. This child is subject to infections more than most children. The caregiver must therefore be extra careful to require all people coming into close proximity of the child wash their hands, and to monitor the health of all individuals coming into close proximity of the child. Although the child and the family caring for it do "not need to live in a bubble," extra caution must be exercised to keep this child away from uncleanliness, infections, and disease.

This child also requires the administration of five different medications for the child's heart and reflux. Those medications must be administered several times over the course of each day, beginning at 1:00 a.m., 7:00 a.m., 9:00 a.m., 1:00 p.m., 6:00 p.m., 7:00 p.m., and 9:00 p.m.

The child also requires a special diet; her food needs to be prepared differently than most baby foods. The caregiver must also regularly monitor this child's temperature, whether the child stops eating, and whether there are any other changes in the child's personality, or coloration. In fact, one week after this child had come to live at the foster home, the foster mother's timely observations avoided disaster so the child could be taken to the hospital, where the child spent 10 days thereafter in a cardiac intensive care unit. It was at this time that the child's cardiomyopathy was diagnosed.

The child is presently residing in the home of Foster Mother, along with her three teenage boys, ages 13, 15, and 17.

According to Foster Mother, Mother frequently visits the child. The visits included two one hour visits the first week the child was in foster care, three visits while the child was in the hospital, and now one two hour visit every week. The mother has managed to attend all of her permitted visits. There have been some gaps in time where Mother was not allowed to visit with the child because of the

medical need to isolate the child from outside sources. Based upon the testimony of Foster Mother, it appears Mother has been cooperative with Foster Mother in order to see her child. It also appears Mother is attentive to the child's needs and is not indifferent or unable to attend to those needs.

The Court next heard the testimony of DFS case worker Rhonda Bailey.

According to Ms. Bailey, and somewhat different than Ms. Westfall's recollection, she informed the Permanency Planning Committee on September 08, 2009, Mother was visiting the baby, including visits at the hospital. Ms. Bailey also stated she informed the Committee Mother was attending Brandywine Counseling three times a week for substance abuse classes. Ms. Bailey recalls telling the Committee Mother was unemployed at the time the Committee met. However, Ms. Bailey said she also informed the Committee Mother had housing since she was living with her mother and grandmother. Ms. Bailey informed the Committee of the child's cardiomyopathy. She also informed the Committee Father was incarcerated.

Ms. Bailey also testified Mother, as of the present hearing, is employed at Arnold Foods. Mother has given Ms. Bailey pay stubs which reflect Mother is employed full time and working night shift hours. Because of Mother's employment, which began October 15, 2009, Mother had to interrupt her substance abuse counseling at Brandywine Counseling during the weeks she was getting break-in training for her employment at Arnold Foods. It was Ms. Bailey's understanding, however, Mother is now employed on a regular shift, and Mother intends to return to her necessary substance abuse counseling at Brandywine Counseling.

Ms. Bailey also referred Mother to a Strengthening Families class. Again, Mother has not been able to attend those classes because of her transitional time of training for her employment. Ms. Bailey understands Mother now intends to start those classes, because her work schedule permits her to attend those classes.[10]

According to Ms. Bailey, Mother has Medicaid insurance. Ms. Bailey has not yet explained to Mother the ability for Mother to obtain Purchase of Care with that insurance, but intends to do so.

Turning to the home where Mother is now residing, that being with her own mother and grandmother, Ms. Bailey indicated the Division believes Mother needs to find housing elsewhere. However, Ms. Bailey acknowledged the home is adequate. It appears the Division's main concern is Mother's grandmother is an older person and needs medical personnel to sometimes come into the house to take care of her. This relates to the possibility of outside persons coming into the home and bringing with them germs that might adversely affect the child. There may also be some concern Mother's own mother resides in the home, and she allowed her own child to go into foster care. However, there was no clear testimony given about the nature of the concerns about Mother's mother, other than Mother had been in foster care.

Contrary to what the Judge's Decision demonstrated in the termination of Mother's parental rights in her other child, Mother has been maintaining contact and cooperating with the DFS worker in the present case. Mother returns telephone

10. The Court is somewhat confused as whether Mother was unable to attend the parenting class because of a conflict in her schedule, or because she was understandably exhausted after working an eight hour night shift on an assembly line.

calls very quickly to the case worker. Furthermore, Mother's interaction with her child, as observed by the case worker, is appropriate with Mother noticing the needs of the child. Mother has even administered medication to the child.

Thus, with the prior child, Mother did not appear at Court, nor did she pursue a case plan. Her parental rights were terminated. So far, Mother has been very different with this child. When the Court asked Mother what was different with this child as compared to her now 5 year old child, in whom her parental rights were terminated, Mother simply indicated she had no hope in the previous case. The Court has to wonder what dynamics are involved where a young girl, impregnated at age 13, is placed into a scenario where, while she herself is in foster care, is asked to attend Court hearings so she can care for a child, when she herself is still very much an adolescent.

By the Court's observation, there has been significant change in Mother's actions towards this child as compared to her first child. Mother did not pursue a case plan relating to the first child; this time, she is. Mother did not appear at many Court appearances relating to the first child; now she is. Mother did not have hope the first time; now she does. And probably most importantly, at 19 years of age, Mother has gained an obvious level of maturity which the Court suspects includes a greater development of her maternal instincts as well as of her responsibilities as an adult to parent her child.

Under Mother's present case plan, she is to obtain suitable housing. She is presently living in a home occupied by her mother and her grandmother. Although the Division expresses some concerns about Mother living in that home, the Court was unable to discern a clear objection to the home. But even more, now that Mother is working, she has filed an application for reunification housing, so she and her child can live in their own dwelling.

Mother's present case plan also requires her to be employed. She became employed two weeks ago. Mother's case plan also requires her to attend doctors' appointments. There have been a few doctors' appointments Mother has not attended. However, the DFS case worker admitted telling Mother attending certain of the initial appointments was not critical, but there would be appointments in the future which she definitely should attend. Keep in mind that Mother is trying to remain employed in her new job. Missing time from work could jeopardize that necessary employment.

Mother's present case plan also requires her to obtain a substance abuse evaluation and follow-up treatment. Mother was attending classes, but then stopped. It is the understanding of the Court that Mother had to stop during her break-in training period for her employment. When the Court wanted to discuss finding a time for appointments that would be suitable for Mother, Mother quickly noted she would be able to return to her appointments now that she is on her regular work schedule. The case plan also requires Mother to attend a parenting class.

In addition to these five categories of Mother's case plan and given the special needs of this child already noted, the Court believes Mother should participate in special training provided to her about the child's needs of medication and diet, and the preparation and administration of medicine and food. Mother also needs to demonstrate she has around-the-clock appropriate people to monitor this child's safety and welfare when she is working.

The Court also learned the present DFS worker did not place Mother into her sub-

stance abuse counseling at Brandywine. Thus, Mother was not there due to a DFS referral. More than likely, Mother was there through her own efforts. Mother also found employment on her own without the assistance of the DFS worker.

The case worker also observed Mother was getting encouragement and assistance from her own mother and grandmother in her present efforts to raise this child.

The Attorney Guardian *ad Litem* for the child asked Ms. Bailey whether she believed a necessary component to the case plan would include Mother undergoing a mental health evaluation and follow-up treatment. The DFS worker responded she did not know at this point in time if a mental health evaluation and follow-up treatment would be a requirement.

The Court also received several records from Brandywine Counseling's Lighthouse Program. The records evidence Mother has regularly attended sessions since August 13, 2009. Although she missed a few sessions, the reports indicate Mother is actively engaged in the programs, has a desire to learn, and is willing to take risks within the group. Mother has stated to the counselor she will do what she needs to do in order to keep her child.

### LAW AND REASONING

The circumstances of this case again bring into question whether the Division of Family Services is the sole arbiter on whether to provide reunification services to a parent whose parental rights were previously involuntarily terminated in a sibling of the child at issue. The Court has been able to find in its research two Decisions on this very issue written by two other Judges of the Family Court, as well as one Decision which touches on this subject written by this particular Judge. These three previous Decisions represent different outlooks on this issue. To the Court's knowledge, the issue has never been brought to the attention of the Supreme Court of the State of Delaware.

The first Opinion on this issue was written by the Honorable Kenneth M. Millman in the case of *In the Interest of Ann Margaret Phillips*, decided July 1, 2002.[11] After a very scholarly analysis of the issue, Judge Millman concluded the Division of Family Services is the sole arbiter on whether to provide reunification services to a parent who has committed a certain enumerated event as described under Title 13, Section 1103(a) of the *Delaware Code*. Judge Millman's case involved a parent who previously committed a serious felony level offense, manslaughter, in which the victim was a child.[12] In the case sub judice, the circumstances specifically enumerated in Title 13 *Delaware Code*, Section 1103(a)(6) are that the parental rights of the parents were previously involuntarily terminated in a sibling of the child at issue. When either of these enumerated events exist, manslaughter of a child in Judge Millman's case, or involuntary termination of parental rights of a sibling in the present case, the consideration of whether to disallow a parent reunification efforts with his or her child is certainly triggered at the outset of the action.

Whereas this Judge concludes such a decision to not offer reunification efforts may be recommended by the Division, but must be finally determined by the Court, Judge Millman concluded that the Division of Family Services had the sole power, given the existence of one of those enumerated events, to make that crucial de-

---

11. *In the Interest of Ann Margaret Phillips*, 806 A.2d 616 (Del.Fam.Ct.2002).

12. 13 Delaware Code Anno., Section 1103(a)(4).

termination without Court approval or review.

Judge Hitch, as will later be explained, held in a different case the Division has the right to make that decision, but subject to being overturned by the Court if the Court finds the Division's decision to be arbitrary and capricious.[13]

The main focus of these three Decisions is the interpretation or constitutionality of the wording in Title 13, Section 1103(d) of the *Delaware Code,* which states:

> The Department is not required to perform, but is not prohibited from performing, reunification and related services outlined in Chapter 90 of Title 29 when the grounds for termination of parental rights are those stated in subsections (a)(2), (4) or (6) of this section.

The enumerated events in subsections (2), (4), and (6) of 1103(a) are:

(2) The child has been abandoned

(4) The parent has been convicted of various specified crimes, such as the manslaughter of a child, or

(6) The parent's parental rights were previously involuntarily terminated in a sibling of the child.

As one notes, the language set forth above in Section 1103(d) makes no mention of a Court determination or review. The Delaware Legislature's language appears to give the Division of Family Services the sole discretion of whether to offer reasonable reunification efforts to parents who have previously been involved in one of the specifically enumerated events referenced in Section 1103(d) and described more specifically in Section 1103(a) of Title 13 of the *Delaware Code.*

The mother in the case of *In the Interest of Ann Margaret Phillips*[14] argued permitting the Division to alone make that decision violated the Doctrine of Separation of Powers by permitting the Division to undertake an act which should be under the authority of the Court. Judge Millman concluded the Delaware Legislature did not violate the Separation of Powers Doctrine in passing Title 13, Section 1103(d) of the *Delaware Code,* which he held extends to DFS the sole power to decide whether to provide reunification services in situations, previously noted, where specified prior circumstances are found to exist.

The facts leading to Judge Millman's Decision involved a mother, who in 1996, had been convicted of manslaughter of the child's sibling. The child for whom the Division decided not to offer reunification services was taken into care five years later in August 2001. Mother's conviction of a felony where the child's sibling was a victim established one of the several enumerated grounds permitting the termination of parental rights in a child and also triggering the non-reunification service provision.[15] Given the holding of Judge Millman, it is not surprising he did not provide any further facts in his Opinion, such as why the later child was brought into care, or whether the mother's lifestyle had significantly changed during the five intervening years between the date of the conviction regarding the manslaughter conviction of the first child and the date of the taking into DFS custody of the second child. Judge Millman disagreed when Mother argued, permitting the Division of Family Services "to unilaterally decide whether or not a parent is to receive ser-

13. *DFS v. B.S. and J.H.,* 2008 WL 2898228 (Del.Fam.Ct., July 3, 2008).

14. *In the Interest of Ann Margaret Phillips,* 806 A.2d 616 (Del.Fam.Ct.2002).

15. DEL.CODE ANN. tit. 13, § 1103(d) (1999) (citing to DEL.CODE ANN. tit. 13, § 1103(a)(4a.)(1999)).

vices would be an infringement upon the authority of the Judicial Branch of government." [16]

In the July 03, 2008 Decision rendered in the case of *Division of Family Services v. B.S. and J.H.,* the Honorable Joelle Hitch took a position somewhat different from Judge Millman.[17] The mother in Judge Hitch's case, somewhat similar to the case sub judice, was a mother whose parental rights had previously been involuntarily terminated in a sibling of the child, in fact, simultaneously terminated in four siblings of the child. Rather than permit the Division of Family Services to be the sole arbiter of making the decision on whether to provide reunification services, Judge Hitch held the Division's decision subject to the Family Court's review. Judge Hitch held the Family Court had the ability to review and reverse the Permanency Committee's decision in the event the Court determined the Permanency Committee was arbitrary and capricious in making their decision. Judge Hitch described an arbitrary and capricious action as an "action taken without consideration of and in disregard of the facts and circumstances of the case." [18] Judge Hitch went on to examine the Permanency Planning Committee's decision by evaluating the best interest of the child under the various best interest factors set forth in Title 13, Section 722 of the *Delaware Code.*

Judge Hitch's Decision upheld the Division's determination not to provide reunification efforts, but only after subjecting the Division's decision to Court review under "an arbitrary and capricious" review standard. Judge Hitch went into considerable detail about the present lifestyles of both

parents, whose rights were previously terminated in four older siblings of the child in question. In Judge Hitch's case, there was a relatively short time period between the termination of parental rights for their failure to plan for the four older siblings, that occurring by Order dated January 11, 2008, and the subsequent action where the child was taken into DFS custody only two months later after Mother gave birth to the child on March 10, 2008. Similar to the case *sub judice,* the child in Judge Hitch's case was born drug positive, and the child's father was incarcerated. But the similarities in the two cases stop there. The mother in Judge Hitch's case expressed to hospital staff her inability to care for the child and her desire to place the child up for adoption. She then left the area and had no further contact with the Division.

It is clear from the reading of Judge Hitch's Decision neither of the parents of the newborn showed any demonstratable change which would cause a Judge to believe that the parents would succeed on present reunification efforts after having failed miserably on reunification efforts with the four previous siblings. Judge Hitch concluded both the mother and father of the four siblings "were afforded two years of opportunities to plan for reunification . . . and neither parent made any substantial steps toward completion of their case plan." [19] As Judge Hitch noted, the four older siblings "lingered in foster care for two years awaiting Mother and Father's completion of a case plan to no avail. It is not in [the baby's] best interest to suffer the same fate. The Court sees no reason to require [the baby] to suffer

**16.** *In the Interest of Ann Margaret Phillips,* 806 A.2d 616, at 617 (Del.Fam.Ct.2002).

**17.** *DFS v. B.S. and J.H.,* 2008 WL 2898228 (Del.Fam.Ct. July 3, 2008).

**18.** *Id.*

**19.** *Id.*

through the instability of foster care at such a critical time in her life . . ." [20]

Having at the time only the benefit of reviewing Judge Millman's 2002 Decision, this Judge rendered a somewhat related Decision on November 18, 2005, in *DFS v. Smith*.[21] The young child in Smith was initially taken into the Division's care on November 18, 2004. Mother had previously had her parental rights terminated in one child in 2001, and in another child in 2002, both for her failure to plan. Because Mother had not demonstrated any dramatic improvement in her lifestyle between her prior involuntary terminations and the present situation, where her lifestyle was almost always driven by her substance abuse, this Judge noted it was content to recognize Judge Millman's finding in the *A.M.P.* case and agreed with the Division's decision not to offer reunification services to Mother. However, this Judge's Decision also provided in *Smith* the following caveat:

> If this case involved circumstances in which a parent whose parental rights had previously been involuntarily terminated, but who had now improved considerably her parenting skills and ability to provide adequate and loving care to her child, this Judge might well have had to respectfully disagree with the learned opinion of his fellow colleague.[22]

The statutes and Court rules from which my two colleagues and I wrote our Opinions have remained the same. Federal Law 42 U.S.C. Section 671(a)(15)(D)(iii) states:

> "In order for a State to be eligible for payments under [The Adoption and Safe Families Act], it shall have a plan approved by the Secretary which . . . 15.

provides that . . . (D) reasonable efforts of the type described in subparagraph (B) shall not be required to be made with respect to a parent of a child if a Court of competent jurisdiction has determined that . . . (iii) that parental rights to the parent to a sibling have been terminated involuntarily."

Federal regulations enacted since the passage of the Adoption and Safe Families Act (ASFA) has further clarified this just cited provision of the Federal law. Federal Regulation 45 C.F.R. 1356.21(b)(3)(iii) states:

> Circumstances in which reasonable efforts to prevent a child's removal from home or to reunify the child and family are not required if the State agency obtains a *judicial determination that such efforts are not required because:* . . . (iii) the parental rights of the parents with respect to a sibling have been terminated involuntarily. (Emphasis added).

Family Court Civil Procedure Rule 214, relating to proceedings of children in the custody of DSCYF, states, in part, *"The Court may determine* that the Department is not required to provide reasonable efforts for reunification if the facts of the case so warrant." (Emphasis added).

Although the focus of this case, as already noted, is the wording of Title 13, Section 1103(d) of the *Delaware Code*, that wording must be reviewed in light of the Federal Legislation and Court Rule just noted. Again, Title 13, Section 1103(d) of the *Delaware Code* states:

> The Department is not required to perform, but is not prohibited from performing, reunification and related ser-

---

**20.** *Id.*

**21.** *DFS v. Smith,* 896 A.2d 179 (Del.Fam.Ct. 2005).

**22.** *DFS v. Smith,* 896 A.2d at 189.

vices outlined in Chapter 90 of Title 29 when the grounds for termination of parental rights are those stated in Subsections (a)(2), (4) or (6) of this Section. As the Court reads the foregoing Federal and State statutes, including the Federal Regulation noted at 45 C.F.R. 1356.21(b)(3)(iii), and also Family Court Rule 214, the Court observes, except for Section 1103(d) of Title 13 of the Delaware Code, all of the other provisions look to the Court for a determination that efforts at reunification are not required. Only Delaware Code Title 13, Section 1103(d) fails to mention the need for Court approval or review.

■ Federal Regulation 45 C.F.R. 1356.21(b)(3)(iii) reads efforts to reunify are not required "if the State agency obtains *a judicial determination that such efforts are not required* because [there has been a prior involuntary termination]". (Emphasis added). This wording is very different than wording that might have stated efforts to reunify are not required "if there is a *judicial determination that there has been a prior involuntary termination.*" (Emphasis added). The latter wording would indicate a prior involuntary termination of parental rights in a sibling would itself trigger the Division's ability to deny reunification efforts without judicial discretion. Certainly, the existence of a prior involuntary termination of parental rights in a sibling is a triggering event. However, the prior involuntary termination is not the end-all event leaving it up solely to the Division to decide whether to offer reunification efforts. The event of a prior involuntary termination in a sibling triggers the earlier than normal ability of the Division to recommend, and the Court to decide, if reunification efforts are not required in the present action. It is this Judge's opinion that such a decision, made only after reviewing all the existing factors relevant to the best interest of the child, especially possible significant improvement in a parent's lifestyle, is a decision to be made by the Court.

In a case where the Division of Family Services takes a child into custody because the child is dependent or neglected in the care of the parents, and where certain prior enumerated circumstances have not occurred, Delaware law requires reunification services be offered to dependent children and their families.[23] In fact, the Delaware Supreme Court has stated "[u]nder Delaware Law, termination of parental rights can only occur if the Family Court is satisfied DFS exerted all reasonable efforts ... to reunify [children] with their natural parent."[24] The Court requires the Division to make reasonable efforts over a reasonable period of time in order that a parent, if willing, has the opportunity to participate in services under a case plan in order to improve their parenting abilities so that their child may be returned to them. Such a parent whose parental rights have not been previously terminated in another child, or who has not committed some other triggering event, such as the manslaughter of a child, may be as hopeless to benefit from reunification efforts as the parent whose parental rights have been previously involuntarily terminated in a sibling or the parent who committed manslaughter against a child. But because the parent who has not developed a prior history leading to one of the enumerated events, such as a prior involuntarily termination or child manslaughter, did not have the benefit of receiving reunification services, we give such parents, as hopeless

23. Del.Code Ann. tit. 29, § 9003 (1999).

24. *Jamison v. DFS*, 768 A.2d 469 (Del.2001), citing *In Re: Burns*, 519 A.2d 638 at 644 (Del.1986).

as the efforts may often initially appear, a chance to change their ways and demonstrate they are able and worthy to care for their child.

When a parent has had their parental rights previously involuntarily terminated in a sibling of a child because the parent failed in previous reunification efforts, and that parent demonstrates nothing to suggest anything but failure can be expected again, the statutory permission to make an immediate and up-front decision to deny reunification services at the outset of the case, as permitted under Title 13 *Delaware Code,* Section 1103(d), clearly makes sense. Denying reunification in a hopeless scenario, bolstered by a previous similar history, saves the Court's time, the State's services and money, and most importantly, moves forward the establishment of a child's permanency in another alternative, such as a termination of parental rights and adoption, or guardianship placement. But when the parent whose parental rights were previously involuntarily terminated in a sibling now demonstrates a significant change in their willingness and ability to succeed in future reunification efforts with a different child, it may well be in the best interest of the child to provide that parent another chance at efforts of reunification with the present child.

To permit the Division to decide reasonable efforts are not required simply on the basis of a prior involuntary termination of a sibling ignores the additional and very necessary finding required in every case leading to the possible termination of parental rights: the Court's finding that the actions are in the child's best interest. Indeed, the wording of Title 13 *Delaware Code,* Section 1103(a) permits a termination of parental rights only where both a ground has been established, such as a

prior involuntary termination, and the Court finds that there is clear and convincing evidence that termination is in the child's best interest.

The difference between Judge Hitch's Opinion and this Judge's Opinion appears to be Judge Hitch would uphold the Division's decision not to offer reunification efforts subject to the Court finding the Division's decision to be arbitrary and capricious. In this Judge's opinion, however, the Court in the first instance, and not the Court in the review of the Division, is required to make the determination to offer or deny reasonable efforts at reunification. A prior involuntary termination of parental rights in a sibling simply places the Division in a position of requesting the Court to make an early determination that reasonable reunification efforts should not be required. It also permits the Court to make such an advance finding, but while always considering the best interest of the child.

When this Judge rendered the 2005 Decision in *DFS v. Smith,* the Court was concerned the precedent set forth in *A.M.P.* would permit the Division to deny a parent reunification services even where "that parent has instituted major positive changes in their life between the first involuntary termination of the child and subsequent Court proceedings involving another child." [25] This Court opined the *A.M.P.* precedent could permit the Division to arbitrarily deny reunification efforts to a parent where the parent had become deserving of those services. The Court recalls part of the impetus for the federal Child Welfare Act enacted on June 17, 1980 [26] was to improve the system of child welfare to provide judicial oversight to ensure State agencies were diligent in

---

25. *DFS v. Smith,* 896 A.2d 179.

26. 42 U.S.C. §§ 608, 620–28, 670–76 (1982).

providing services to avoid the breakup of families and to be sure children did not remain unnecessarily long in foster care.[27] The Adoption and Safe Families Act (ASFA) of 1997, increased the intensity and frequency of judicial oversight in this area and placed specific time limitations to speed along a child's attainment of permanency.[28] In this Judge's opinion, regular judicial review and oversight not only holds all parties' feet to the fire, parents and State agency workers, alike, the existence of judicial oversight creates a greater trust and willingness of the parents to accept the assistance of social workers and are less likely to view social workers, as in the past, as holding unbridled authority that cannot be trusted.

My very respected colleague, Judge Millman, who has led our Delaware Family Court Judges in improving how we deal with these dependent/neglected children and their families, concluded that our Delaware Legislature had passed legislation that did not violate the Separation of Powers Doctrine. By doing so, Judge Millman concluded that the Delaware Legislature, in setting out Title 13 *Delaware Code*, Section 1103(d), created a valid statute which made the Division the sole arbiter of determining whether they could deny offering reunification services to a parent where certain previously enumerated acts existed, such as in this case, the prior involuntary termination of the parental rights in a sibling. I must respectfully disagree with my learned colleague's opinion. In my opinion, unless the Delaware law is construed to permit a judicial determination of when reunification efforts should not be permitted, such a law, as I previously stated, "violates the Doctrine of Separation of Powers by divesting the Court of its discretion in the long-recognized judicial role of making findings of fact which are in the best interest of a child." [29]

Although the Court previously set forth its logic and cases in support of the foregoing conclusion in its 2005 Decision of *DFS v. Smith*,[30] the Court feels it is important enough to restate, apologetically almost verbatim, portions of its prior Opinion. As previously stated, in describing the Doctrine of Separation of Powers, the Delaware Supreme Court has stated, "This doctrine broadly stated is that a function inherently legislative may not be delegated to the executive or to the judiciary; and similarly, functions executive or judicial in nature may not be delegated to one of the other branches of government." [31] Our Delaware Supreme Court has also stated that, "... the doctrine of separation of powers ... in Delaware ... does not obtain in full force as it does in some of the states." [32] Thus, where there has been a history tacitly accepted by the separate bodies of government where one entity has traditionally carried out the authority which would generally be carried out by the other entity, Delaware has allowed a "practical construction" or exception to the doctrine of the separation of powers.[33]

Our Delaware Supreme Court has also set forth the basic principles of statutory construction when it stated the following:

27. *In the matter of Derek W. Burns*, 519 A.2d 638, 647 (Del.1986).

28. 42 U.S.C. 620 at sec. seq., 670 at sec.

29. *DFS v. Smith*, 896 A.2d at 189

30. 896 A.2d 179 (Del.Fam.Ct.2005).

31. *Brennan v. Black*, 104 A.2d 777 (Del.1954).

32. *Brennan v. Black*, 104 A.2d 777 (Del.1954).

33. *Brennan v. Black*, 104 A.2d 777 (Del.1954) and *Opinion of the Justices*, 380 A.2d 109 (Del.1977).

[*128] ... If the words of a statute are clear and unambiguous and if their meaning is consistent with the underlying intent of the statute, there is no room for construction. In such a case it is the duty of a court ... to accept the language of the statute as embodying the legislative will. (Citations omitted). On the other hand, the literal meaning of a statute is not to be followed ... when it departs from the true intent and purpose of the statute and to conclusions inconsistent with the general purpose of the act. (Citation omitted) ... [34]

The Delaware Supreme Court in the 2005 case of *Sampson v. Division of Family Services*, 868 A.2d 832 (Del.2005) recognized the dual necessity in a case terminating parental rights of establishing (1) a specific ground, which, in the *Sampson* case, involved the parental rights over another child having been previously involuntarily terminated, and, as required in all termination cases, (2) termination is in the best interest of the child.[35]  In all cases where the Division becomes involved because a parent's care of their child makes that child dependent or neglected, the continuing, persistent, and ever present paramount concern is for the child's health and safety.  The protection of the health and safety of a child are part of protecting the best interest of that child.  There is never a moment in the process, from the Division's first involvement to the ultimate finding of permanency for the child, which could be in the form of reunification with a parent, termination of parental rights and adoption, or placement with a guardian, in which there is an interruption of the Court's concern for the child's general health, safety, welfare, and best interest. While the Division of Family Services is directed to promote those goals, it is al-ways the Court that makes the final decision of whether those goals are being met. If, indeed, the wording of Title 13 *Delaware Code*, Section 1103(d) was intended by the Legislature to remove the Court from the decision to offer reunification services to a parent identified by a certain enumerated act, then the Legislature has removed the Court from both its statutory and traditional role of determining that denying those reunification services to a parent is, for that particular child, in the child's best interest.  If that is, indeed, how the statute is to be construed, then this Court finds that the statute violates the Doctrine of the Separation of Powers and has no history of this obligation of the Court being tacitly delegated to another branch of government.

On the other hand, given the Delaware statute was created in response to the original ASFA statute set forth in Federal Law 42 U.S.C., Section 671(a)(15)(D)(iii), which permitted reasonable reunification efforts to be denied in certain enumerated circumstances, it is conceivable the Delaware Legislature's intent is to have us read Section 1103(d) subject to the same qualification and explanation provided to the Federal statute under the subsequently enacted Federal Regulation 45 C.F.R. 1356.21(b)(3)(iii).  The Federal Regulation, as already explained, placed back on the Court the need to decide whether reasonable efforts are required when certain enumerated circumstances are found to exist. In either case, judicial authority to keep secure a child's best interest throughout a case can never be interrupted or, even for a brief point in time, delegated elsewhere.

█ In the case now before the Court, this child's mother has demonstrated sig-

---

**34.** *Opinions of the Justices,* 88 A.2d 128 (Del. 1952).

**35.** *DFS v. Smith,* 896 A.2d 179.

nificant positive child rearing and parental responsibility changes in her life. Much of this change may simply have occurred because this mother is now 19 years of age rather than an adolescent mother living in foster care who previously gave birth at 14 years of age. The Court believed Mother when she stated she was overwhelmed by the system previously and felt there was nothing she could do. Now Mother believes there is something she can do. Mother's present actions support her professed belief. She found employment on her own. She started substance abuse counseling on her own. Mother has housing, and she has also, again on her own, taken the necessary action to find more suitable housing. Mother is regularly attending visits with her child, and the interaction during those visits is appropriate. Although the Court has certain concerns about this child's health, the Court is of the opinion Mother is capable of providing for this child's needs so long as she continues to diligently pursue the positive course of changes on which she has already made significant progress.

The Division's motion to not offer reunification services to Mother is hereby **DENIED**. The permanency goal as to Mother shall continue to be reunification. The Division shall make reasonable efforts to offer reunification services to Mother.

IT IS SO ORDERED this 18th day of December, 2009.